# Exhibit A

# SUPPLY AGREEMENT

This **SUPPLY AGREEMENT** ( this **"Agreement"**) is effective as of the January 1, 2015 ("**Effective Date**") by and between General Electric Company, a New York corporation acting through its GE Power & Water business, having a principal place of business at 1 River Road, Schenectady, New York 12345 ("Buyer") and SKF USA Inc., a Delaware corporation, having a principal place of business at 890 Forty Foot Road, P.O. 352, Lansdale, Pennsylvania 19446 ("**Seller**").

## 1. BUYER PURCHASES

(a) Buyer or any of its "Affiliates" (as defined in subsection (b) below) who satisfy Seller's reasonable credit approval policies may purchase any or all of the goods ("Components") specified in Appendix 1 during the Term (as defined below) at the prices and on the terms and conditions set forth in this Agreement. Reference to Buyer shall mean Buyer or Buyer's applicable Affiliate, when such Affiliate places Orders (as defined below) under this Agreement; provided, however, Buyer shall be the only party that can assign this Agreement or cause this Agreement to expire or terminate pursuant to the Section 3 below. The foregoing does not limit any Affiliate's rights under an Order. Buyer's Annual Purchase Commitment is defined in and set forth on Appendix 1. Any Components purchased by Buyer's Affiliates shall be counted toward Buyer's Annual Purchase Commitment and any events which, pursuant to the terms of this Agreement, would cause a reduction in Buyer's Annual Purchase Commitment if experienced by Buyer, shall reduce Buyer's Annual Purchase Commitment if experienced by an Affiliate.

(b) An Affiliate, with respect to either Buyer or Seller, shall mean any entity, including without limitation, any individual, corporation, company, partnership, limited liability company or group, that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with either Buyer or Seller, as applicable. If an Affiliate of Seller will be selling Components to either Buyer or an Affiliate of Buyer, this Agreement will be amended to add such Seller Affiliate. The parties expressly agree that (i) Buyer shall have no liability nor shall Buyer incur any obligations or be responsible for the failure of any Affiliate to perform its obligations under this Agreement or any Order; and (ii) Seller shall have no liability nor shall Seller incur any obligations or be responsible for the failure of any Affiliate to perform its obligations under this Agreement or any Order. In enforcing its rights under this Agreement and under any Order, each party shall look solely to the other contracting entity under the Order, either Buyer or its applicable Affiliate or Seller or its applicable Affiliate, as the case maybe. Should an Affiliate not perform its obligations under an Order, including not making payments under an Order or not delivering Components, either Buyer or Seller, as applicable, shall provide reasonable assistance to the other party to resolve the issue with its Affiliate.

(c) All purchases under this Agreement are subject to issuance of purchase orders ("Orders") by Buyer pursuant to GE Power & Water Standard Terms of Purchase Rev. A (the "Purchase Terms") which are incorporated by reference as Appendix 2, and any agreed updates, changes and modifications to the same. Notwithstanding the foregoing, if Buyer's Affiliate is not a U.S. entity it shall purchase under its applicable version of the Purchase Terms ("Other Terms of Purchase"), which shall be referenced in the applicable Affiliate's Order; provided, however, the Other Terms of Purchase shall be deemed to include the modifications made to the Purchase Terms or any negotiated version of the Other Terms of

Purchase between the applicable Affiliate and Seller. In the event of a purchase under this Agreement by a non-U.S. entity, all references herein to Purchase Terms shall mean the applicable Affiliate's Other Terms of Purchase and shall be deemed incorporated by reference into this Agreement. All Orders, acceptances and other writings or electronic communications between the parties shall be governed by this Agreement, and it is intended that reference to this Agreement shall include all appendices hereto and, in case of conflict, the following order of precedence will prevail: i) this Agreement; ii) the Appendices to this Agreement; iii) individual Orders; and iv) drawings, specifications and related documents specifically incorporated herein by reference.

(d) Subject to Seller being able to meet the established quality, technical and qualification requirements for Components, Buyer shall comply with its Annual Purchase Commitment for Components subject to terms herein.

(e) Buyer's Annual Purchase Commitment during the Term is further dependent on the Seller's continuing ability to meet the established delivery, quality, technical or qualification requirements. In addition to any rights set forth herein, Buyer reserves the right to reduce its Annual Purchase Commitment in any calendar year without liability to Buyer upon schedule slip for: (i) Seller's failure to meet Buyer's quality, technical, or qualification requirements that are communicated to Seller from time to time; or (ii) from any shipment/delivery dates on Orders beyond the applicable liquidated damages time period specified in Section 6 below. Such reduction shall be commensurate with number of Components that are affected by the foregoing events. Prior to taking any such reduction as specified in this subsection (f) for quality, technical or qualification requirements, Buyer shall provide Seller notice and the parties shall agree on a reasonable timeframe for Seller to address the issue.

(f) Seller shall be obligated to sell to Buyer during the Term and in accordance with the terms of this Agreement the volume of Components equivalent to Buyer's Annual Purchase Commitment.

(g) Seller covenants and agrees to possess and maintain the necessary capacity, machinery, personnel and resources to sell to Buyer at least the number of Components that are necessary to fulfill Buyer's Annual Purchase Commitment during the Term. During the Term, Seller shall not enter into any contracts that interfere or disrupt the guaranteed capacity to Buyer.

(h) Buyer shall not have any obligations, or responsibility to make any purchases or payments, as the case may be, pursuant to this Agreement in the event and to the extent Seller is unable, unwilling or incapable of accepting, performing or completing any Order from Buyer for Components, including, without limitation, due to excused or unexcused performance by Seller under any Order issued pursuant to this Agreement, material default or other non-compliance by Seller of its obligations under this Agreement Buyer's Annual Purchase Commitment for the applicable time period during the Term shall be reduced in an amount commensurate with the circumstances described in the foregoing sentence.

(i) Except for Buyer's Annual Purchase Commitment, this Agreement does not create any commitment by or obligation upon Buyer to place any minimum percentage or volume of its requirements for Components with Seller; provided however Buyer's Annual Purchase Commitment shall be subject to reduction as described herein. Notwithstanding anything herein to the contrary, Buyer may terminate this Agreement prior to the expiration of the Term without liability as provided Section 3(c) in the

event of any material breach by Seller of the terms of this Agreement; and as otherwise provided pursuant to the terms of this Agreement, including its attachments.   In such event, Buyer shall no longer have any liability for the Annual Purchase Commitment and shall exercise its rights in accordance with the Purchase Terms set forth in Appendix 2 as described in Section 3(c) herein.

(j) At Seller's initiation, Buyer shall provide Seller with an annual nonbinding forecast of its Component requirements for the subsequent year by September 15th of each year of the Term. Seller will initiate a discussion with Buyer during September to come to mutual agreement on the expected target volume of Components to be supplied from Seller for the subsequent year.

(k) Buyer will issue to Seller Orders for Components at least six (6)-months before Buyer's required delivery date.

## 2. PRICES AND PAYMENT

The baseline Prices shall be as stated in the Appendix 1.  No extra charges of any kind will be allowed unless specifically agreed in writing by Buyer.  The Payment Terms are as set forth Section 2.2 of the Purchase Terms attached as Appendix 2.  Buyer reserves the right to renegotiate pricing for quantities ordered in excess of Buyer's Annual Purchase Commitment.

## 3. TERM AND TERMINATION

(a) Unless extended or unless terminated under this Section 3, this Agreement will remain in effect for from the Effective Date to January 1, 2018 (the "Term").

(b) Buyer may terminate this Agreement at any time without cause by giving one hundred eighty days (180) days prior notice to Seller. Upon such termination (other than due to Seller's insolvency or default including failure to comply with the Agreement or any Order issued hereunder), Buyer and Seller shall exercise their rights in accordance with Section 11.1 of the Purchase Terms set forth in Appendix 2.  Seller hereby waives all termination for convenience claims not specifically reserved in this Agreement.

(c) Either party may terminate this Agreement if the other party commits a material breach of this Agreement that remains uncured thirty (30) days after written notice is delivered to such breaching party.  In the event Buyer terminates this Agreement due to Seller's material breach, Buyer may terminate this Agreement, in whole or in part, including any or all Orders issued hereunder, without any liability, including without limitation any liability with regards to Buyer's Annual Purchase Commitment, consistent with the rights set forth in Section 11.2 of the Purchase Terms, attached as Appendix 2 provided however nothing precludes Buyer from enforcing its rights under this Agreement in contract, law and in equity.

(d) Upon termination of this Agreement for any reason, Seller agrees to return to Buyer all confidential information of Buyer or its Affiliates, and all Buyer-owned tooling, test equipment and other property. Buyer will bear all usual and reasonable costs of the return of such tooling, test equipment and property.  Such returned tooling, test equipment and property must be fully functional and undamaged, except for reasonable wear; otherwise, Seller shall bear all costs associated with repair or replacement.

## 4. NOTICES

All notices under this Agreement shall be deemed to have been effectively given when sent by facsimile or mailed via certified mail return receipt requested, properly addressed to the other party at the address below or at such other address as the party has designated in writing.

| Buyer | Seller |
|---|---|
| Marta Benedek | SKF USA Inc. |
| GE Hungary Kft. | Samuel S. DiRenzo |
| East Gate Business Center, Akácos | 890 Forty Foot |
| F2 Building | P.O. Box 352 |
| 2151 Fot | Lansdale, PA  19446 |
| | |
| With a copy to: | With a copy to: |
| Attn: Sourcing Counsel | Attn:  SKF USA Inc. Legal Department |
| GE Power & Water | SKF USA Inc. |
| 1 River Road | 890 Forty Foot Road |
| Schenectady, New York  12345 | P.O. Box 352 |
| | Lansdale, PA  19446 |

## 5. LIMITATION OF LIABILITY

(a)  The total liability of Seller under this Agreement as to Buyer and its Affiliates will not exceed, in the aggregate in any calendar year sixty-two and one half percent (62.5%) of the U.S. dollar value of all Components ordered in the prior calendar year; provided, however, that any liability arising from Serial Defects (as defined in Section 9 of the Purchase Terms) arising in a calendar year pursuant to Section 9.3 (Warranties) shall be capped at the U.S. dollar value of all Components ordered in the prior calendar year.  Notwithstanding the foregoing, the limitation of liability set forth in this Section 5 will not apply in the event of Seller's liability for: (i) fraud or willful misconduct by Seller; (ii) its failure to pay its subcontractors when due and payable; or (iii) Seller's indemnification obligations under Section 12 (Indemnity and Insurance) of the Purchase Terms for personal injury, death, or third party property damage; (iv) breach of Section 16 (Confidentiality of Proprietary Information and Publicity) of the Purchase Terms; or (v) indemnification obligations under Section 17 (Intellectual Property Indemnification) of the Purchase Terms.  Notwithstanding the foregoing, the parties agree that the calculation for the total liability for the initial calendar year of the Term will be based upon sales forecasted for 2015 in the amount of $2,177,250.00 USD, which will be revised up or down based on actual sales for 2015.

(b)  IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, EXEMPLARY, INCIDENTAL, INDIRECT, PUNITIVE, OR CONSEQUENTIAL DAMAGES FROM OR RELATED TO THIS AGREEMENT.  NOTWITHSTANDING THE FOREGOING, THE PARTIES EXPRESSLY AGREE THAT ANY CLAIMS FOR SPECIAL, EXEMPLARY, INCIDENTAL, INDIRECT, PUNITIVE, OR CONSEQUENTIAL DAMAGES BROUGHT AGAINST BUYER WHICH ARISE FROM PERSONAL INJURY, DEATH, THIRD PARTY PROPERTY DAMAGE AND WERE DETERMINED TO HAVE RESULTED FROM SELLER'S LIABILITY UNDER SECTION 12 (INDEMNITY AND INSURANCE) OF THE PURCHASE TERMS OR  WERE DETERMINED TO HAVE RESULTED FROM SELLER'S LIABILITY UNDER SECTION 17 (INTELLECTUAL PROPERTY INDEMNIFICATION) OF THE

PURCHASE TERMS SHALL IN ALL INSTANCES BE DEEMED TO BE DIRECT DAMAGES AND SHALL NOT BE LIMITED BY THIS SECTION 5(b).

## 6. LIQUIDATED DAMAGES

Notwithstanding anything in the Purchase Terms to the contrary, in the event that Seller delivers the Components later than scheduled, Buyer may assess liquidated damages for the delay period. Subject to the terms herein, the parties agree that such amounts are an exclusive remedy for the delay period only and are reasonable pre-estimate of such damages Buyer will suffer as a result of delay based on circumstances existing at the time an Order was issued and are to be assessed as liquidated damages and not as a penalty. Specifically, Buyer may assess liquidated damages in the amount of five percent (5%) of the value of the relevant Components per week not delivered up to a delay period of ten (10) weeks, for a maximum amount of liquidated damages of fifty percent (50%) of the value of the Components over the delay period. Buyer's resort to liquidated damages for the delay period does not preclude Buyer's right to other remedies, damages and choices under this Agreement or any Order other than the damages resulting from the delay period, including, but not limited to Buyer's right to terminate this Agreement for non-delivery immediately (without any further notice or cure period) following the close of the delay period.

## 7. COMPLIANCE AND GOVERNING OF LAW

Seller represents and warrants that it will comply with all laws applicable to this Agreement, and acknowledges that it has received, reviewed and agrees to implement an integrity guide that addresses the same or similar requirements as those set forth in the ***GE Power & Water Integrity Guide for Suppliers, Contractors and Consultants* set forth in Appendix 3**. The governing law of this Agreement will be as set forth in the applicable Purchase Terms attached as Appendix 2. All rights of the parties are as set forth in this Agreement.

## 8. ASSIGNMENT, WAIVER AND SURVIVAL

Buyer may assign this Agreement to any of its Affiliates who meet Seller's commercially reasonable credit approval requirements and agree in writing to be bound by the terms and conditions of this Agreement. Because performance of this Agreement is specific to Seller, Seller may assign this Agreement only upon Buyer's prior written consent. No claim or right arising out of a breach of this Agreement shall be discharged in whole or part by waiver or renunciation unless such waiver or renunciation is supported by consideration and is in writing signed by the aggrieved party. No failure by either party to enforce any rights hereunder shall be construed a waiver. All parts of this Agreement which by their nature or effect are required or intended to be observed, kept or performed after the termination or expiration of this Agreement including, without limitation, provisions or obligations relating to liability and its limitations, warranties, indemnities or confidentiality shall survive the expiration and termination of this Agreement and shall remain binding upon the parties and their successors and assigns.

## 9. ENTIRE AGREEMENT

This instrument, with such documents expressly incorporated by reference, is intended as a complete, exclusive and final expression of the parties' agreement with respect to such terms as are included herein. There are no representations, understandings or agreements, written or oral, which are not included herein. This Agreement may be executed in one or more counterparts in facsimile or other written form, each of which shall be considered an original instrument, but all of which shall be

considered one and the same agreement, and shall become binding when one or more counterparts have been signed by each of the parties hereto and delivered to the other party.

## 10. CONFIDENTIALITY
The parties agree that the terms of this Agreement and information exchanged pursuant to this Agreement shall be subject to Section 16 (Confidential or Proprietary Information and Publicity) of the Purchase Terms.

## 11. DISPUTE RESOLUTION
In the event of a claim or controversy arising out of or relating to this Agreement, the parties will negotiate in good faith to resolve such claim or controversy. For example if a claim or controversy arises from a Serial Defect in the goods, both parties will meet to discuss the impact on Buyer's installed-base of products, the implications of any such serial defect, and how the parties can best resolve the situation. If a mutual agreement has not been reached after thirty (30) days, the parties will conduct a settlement conference for the controversy, or claim between the senior management of the parties. If the settlement conference does not resolve the parties' disputes, they shall the right to pursue their legal, equitable and contract rights as set forth in Section 21 of the Order.

### [SIGNATURES TO FOLLOW]

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed by their respective authorized representatives as of the date set forth below.

**GENERAL ELECTRIC COMPANY,**
**ACTING THROUGH ITS GE POWER**
**& WATER BUSINESS**

Signed: _Anthony Long_

Name: _Anthony D Long_

Title: _GM, Global Sourcing_

Date: _5/8/2015_

**SKF USA INC.**

Signed: _Keith Weiss_

Name: _Keith C. Weiss_

Title: _VP of Sales_

Date: _5/8/2015_

7

## ATTACHMENTS

Appendix 1: Description, Quantity and Price List of Components

Appendix 2: Purchase Terms

Appendix 3: GE Power & Water Integrity Guide for Suppliers, Contractors and Consultants

## APPENDIX 1

### Description, Quantity and Price List of Components

1.    Component Description

Seller shall manufacture the following Components for Buyer:

- 240/710 ECAC2HW33RE10 to be delivered out of Seller's manufacturing facility in Hanover, Pennsylvania; and

- 240/750 ECAC2HW33RE10 to be delivered out of Seller's manufacturing facility in Hanover, Pennsylvania.

2.    Pricing and Annual Purchase Commitment

Annual Purchase Commitment for each Component shall mean the lesser of the number of Components under the heading "Minimum Number of Units" specified in Table 2 below or (i) for year 2015, the number of Components specified under the heading "Committed Volume" in Table 2 below or (ii) for years 2016 and 2017, the percentage of the Buyer 2.3/2.0 Requirement (as defined below) specified under the heading "Committed Volume" in Table 2.

Buyer 2.3/2.0 Requirement shall mean the number of Components required in the Americas (US, Canada, Mexico, and Latin America) by Buyer or its Affiliates for the wind turbine model 2.3/2.0.

**Table 1**

| Year | SKF Part Number | Price Per Unit in USD | | Ex-Works |
|------|-----------------|-----------------------|---|----------|
| 2015 | 240.710ECH2HW33RE10 | $9,500 | | Hanover |
| 2016 | 240.750ECH2HW33RE10 | $12,705 | | Hanover |
| 2017 | 240.750ECH2HW33RE10 | $12,655 | | Hanover |

**Table 2**

| Year | SKF Part Number | Minimum No. of Units | Committed Volume |
|------|-----------------|----------------------|------------------|
| 2015 | 240.710ECH2HW33RE10 | 0 | 100 units for the model 1.6-100 turbine* |
| 2016 | 240.750ECH2HW33RE10 | 240 | 20% of Buyer 2.3/2.0 Requirement |
| 2017 | 240.750ECH2HW33RE10 | 600 | 46% of Buyer 2.3/2.0 Requirement |

* Notwithstanding anything in this Agreement to the contrary, the parties may renegotiate the price for the Components for year 2015 if the number of units sold is less than 100 units or is greater than 200 units.

# APPENDIX 2

## GE POWER & WATER STANDARD TERMS OF PURCHASE REV. A

**1.    ACCEPTANCE OF TERMS.** Seller agrees to be bound by and to comply with all terms set forth herein and in the purchase order, to which these terms are attached and are expressly incorporated by reference (collectively, the "Order"), including any amendments, supplements, specifications and other documents referred to in this Order. Acknowledgement of this Order, including without limitation, by beginning performance of the work called for by this Order, shall be deemed acceptance of this Order. The terms set forth in this Order take precedence over any alternative terms in any other document connected with this transaction unless such alternative terms are:  (a) part of a written supply agreement ("Supply Agreement"), which has been negotiated between the parties and which the parties have expressly agreed may override these terms in the event of a conflict; and/or (b) set forth on the face of the Order to which these terms are attached.  In the event these terms are part of a written Supply Agreement between the parties, the term "Order" used herein shall mean any purchase order issued under the Supply Agreement.  This Order does not constitute an acceptance by Buyer of any offer to sell, any quotation, or any proposal.  Reference in this Order to any such offer to sell, quotation or proposal shall in no way constitute a modification of any of the terms of this Order.  **ANY ATTEMPTED ACKNOWLEDGMENT OF THIS ORDER CONTAINING TERMS INCONSISTENT WITH OR IN ADDITION TO THE TERMS OF THIS ORDER IS NOT BINDING UNLESS SPECIFICALLY ACCEPTED BY BUYER IN WRITING.**

**2.    PRICES, PAYMENTS AND QUANTITIES.**

2.1    *Prices.*  All prices are firm and shall not be subject to change.  Seller's price includes all payroll and/or occupational taxes, any value added tax that is not recoverable by Buyer and any other taxes, fees and/or duties applicable to the goods and/or services purchased under this Order; provided, however, that any value added tax that is recoverable by Buyer, state and local sales, use, excise and/or privilege taxes, if applicable, will not be included in Seller's price but will be separately identified on Seller's invoice.  If Seller is obligated by law to charge any value added and/or similar tax to Buyer, Seller shall ensure that if such value added and/or similar tax is applicable, that it is invoiced to Buyer in accordance with applicable rules so as to allow Buyer to reclaim such value added and/or similar tax from the appropriate government authority.  Neither party is responsible for taxes on the other party's income or the income of the other party's personnel or subcontractors.  If Buyer is required by government regulation to withhold taxes for which Seller is responsible, Buyer will deduct such withholding tax from payment to Seller and provide to Seller a valid tax receipt in Seller's name.  If Seller is exempt from such withholding taxes or eligible for a reduced rate of withholding tax as a result of a tax treaty or other regime, Seller shall provide to Buyer a valid tax residency certificate or other documentation, as required by the applicable government regulations, at a minimum of thirty (30) days prior to payment being due.  Seller warrants the pricing for any goods or services shall not exceed the pricing for the same or comparable goods or services offered by Seller to third parties.  Seller shall promptly inform Buyer of any lower pricing levels for same or comparable goods or services and the parties shall promptly make the appropriate price adjustment.

2.2    *Payments.*

(a)    Payment Terms. Unless otherwise stated on the face of this Order, Buyer will initiate payment on or before ninety (90) days from the Payment Start Date. The ninetieth (90th) day after the Payment Start Date shall hereinafter be referred to as the "Net Due Date". The Payment Start Date is the latest of the required date identified on the Order, the received date of the goods and/or services in Buyer's receiving system or the date of receipt of valid invoice by Buyer. The received date of the goods and/or services in Buyer's receiving system will occur: (i) in the case where the goods are shipped directly to Buyer and/or services are performed directly for Buyer, within forty-eight (48) hours of Buyer's physical receipt of the goods or services; (ii) in the case of goods shipped directly to:  (A) Buyer's customer or a location designated by Buyer's customer ("Material Shipped Direct" or "MSD"); or (B) a non-Buyer/non-customer location to be incorporated into MSD, within forty-eight (48) hours of Seller presenting Buyer with a valid bill of lading confirming that the goods have been shipped from Seller's facility; (iii) in the case where goods are shipped directly to a third party in accordance with this Order, within forty-eight (48) hours of Buyer's receipt of written certification from the third party of its receipt of the goods; or (iv) in the case of services performed directly for a third party in accordance with this Order, within forty-eight (48) hours of Buyer's receipt of written certification from Seller of completion of the services.

(b)    Miscellaneous. Seller's invoice shall in all cases bear Buyer's Order number and shall be issued no later than one hundred and twenty (120) days after receipt of the goods by Buyer and/or Seller's completion of the services. Buyer shall be entitled to reject Seller's invoice if it fails to include Buyer's Order number, is issued after the time set forth above or is otherwise inaccurate, and any resulting: (i) delay in Buyer's payment; or (ii) nonpayment by Buyer shall be Seller's responsibility. Seller warrants that it is authorized to receive payment in the currency stated in this Order. No extra charges of any kind will be allowed unless specifically agreed in writing by Buyer. Buyer shall be entitled at any time to set-off against Seller any and all amounts owed by Seller to Buyer or a Buyer Affiliate (defined below) on this or any other order. "Affiliate" shall for the purposes of this Order mean, with respect to either party, any entity, including without limitation, any individual, corporation, company, partnership, limited liability company or group, that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such party.

2.3    *Quantities.*

(a)    General. Buyer is not obligated to purchase any quantity of goods and/or services except for such quantity(ies) as may be specified either: (i) on the face of an Order; (ii) in a release on the face of an Order; or (iii) on a separate written release issued by Buyer pursuant to an Order. Unless otherwise agreed to in writing by Buyer, Seller shall not make material commitments or production



arrangements in excess of the quantities specified in Buyer's Order or release and/or in advance of the time necessary to meet Buyer's delivery schedule. Should Seller enter into such commitments or engage in such production, any resulting exposure shall be for Seller's account. Goods delivered to Buyer in excess of the quantities specified in Buyer's Order or release and/or in advance of schedule may be returned to Seller at Seller's risk and expense, including but not limited to any cost incurred by Buyer related to storage and handling of such goods.

(b)    Replacement Parts. Replacement parts for goods purchased by Buyer hereunder are for the purpose of this Section defined as "Parts" and are included in the definition of "goods" under this Order. For all goods ordered by Buyer's Measurement and Control Solutions, Industrial Solutions or Wind Energy businesses and if expressly required on the face of this Order by another Affiliate, group, division and/or business unit of Buyer, Seller shall provide Parts: (i) to Buyer's Measurement and Control Solutions and Industrial Solutions businesses for a period of five (5) years after production of the goods ceases; and (ii) to Buyer's Wind Energy business for period of twenty (20) years after production of the goods ceases. Seller shall use reasonable commercial efforts to continue to supply such Parts past the five-year period for Buyer's Measurement and Control Solutions and Industrial Solutions businesses and the twenty-year period for Buyer's Wind Energy business if Buyer orders at least twenty (20) Parts per year during such five-year or twenty-year period, as applicable. The prices for any Parts purchased in the first two (2) years of the five-year or twenty-year period shall not exceed those prices in effect at the time production of the goods ceases, and no set-up charges shall be permitted by Seller or paid by Buyer during this two-year period. Thereafter, the prices for Parts shall be negotiated based on Seller's actual cost of production of such Parts plus any special packaging costs. No minimum order requirements shall apply unless the parties mutually agree in advance. After the end of the above-referenced five-year and twenty-year periods, Seller shall continue to maintain in good working condition all Seller-owned tooling required to produce the Parts, and shall not dispose of such tooling without first contacting Buyer and offering Buyer the right to purchase such tooling from Seller. Seller's obligations with regard to Buyer-owned tooling are set forth in Section 4, "Buyer's Property".

## 3.    DELIVERY AND TITLE PASSAGE.

3.1    *Delivery.* Time is of the essence of this Order. If Seller delivers the goods or completes the services later than scheduled, Buyer may assess such amounts as may be specified in the Supply Agreement as liquidated damages for the delay period. The parties agree that such amounts, if stated on the face of an Order, are an exclusive remedy for the damages resulting from the delay period only; are a reasonable pre-estimate of such damages Buyer will suffer as a result of delay based on circumstances existing at the time the Order was issued; and are to be assessed as liquidated damages and not as a penalty. In the absence of agreed liquidated damages, Buyer shall be entitled to recover damages that it incurs as a result of Seller's failure to perform as scheduled. Buyer's resort to liquidated damages for the delay period does not preclude Buyer's right to other remedies, damages and choices under this Order other than the damages resulting from the delay period, including, but not limited to Buyer's right to terminate this Order for non-delivery. All delivery designations are INCOTERMS 2010. Unless otherwise stated on the face of this Order, all goods provided under this Order shall be delivered FCA Seller's facility, except goods that are to be shipped directly to Buyer's customer or a location designated by Buyer's customer that are: (a) not to be exported; or (b) exported from the United States of America ("U.S."), shall be delivered EXW Seller's facility. The term EXW used herein is modified from the INCOTERMS 2010 definition to mean "EXW with Seller responsible for loading the goods at Seller's risk and expense". Buyer may specify contract of carriage in all cases. Failure of Seller to comply with any such Buyer specification shall cause all resulting transportation charges to be for the account of Seller and give rise to any other remedies available at law or equity.

3.2    *Title Passage.* Unless otherwise stated on the face of this Order: (a) title to goods shipped from the U.S. for delivery to all locations shall pass at: (i) Seller's dock for goods shipped directly to a non-Buyer's facility; (ii) port of import for goods shipped to Buyer's non-U.S. facility; and (iii) Buyer's dock for goods shipped to Buyer's U.S. facility; (b) title to goods shipped from one country in the European Union ("EU") for delivery to another country within the EU, shall pass: (i) when the goods leave the territorial land, air or sea space of the EU source country for goods shipped directly to a non-Buyer's EU facility; and (ii) at Buyer's dock for goods shipped to Buyer's EU facility; (c) title to goods shipped from the source country for delivery within the source country (excluding shipments within the U.S., which are governed by subsection (a) above) shall pass at: (i) Seller's dock for goods shipped directly to a non-Buyer's facility; and (ii) Buyer's dock for goods shipped to Buyer's facility; (d) title to goods shipped from outside the U.S. for delivery to a different country outside the U.S. (excluding shipments within the EU, which are governed by subsection (b) above) shall pass at: (i) the port of export after customs clearance for goods shipped directly to a non-Buyer's facility; and (ii) port of import if shipped to Buyer's facility; and (e) title to goods shipped from outside the U.S. for delivery within the U.S. shall pass at: (i) the port of export after customs clearance for goods shipped directly to a non-Buyer's facility; and (ii) Buyer's dock if shipped to Buyer's facility. Goods ordered by GE Global Sourcing, LLC and shipped to the U.S. from outside the U.S. via ocean transport shall have title pass to GE Global Sourcing, LLC immediately prior such goods entering the territorial land, sea or overlying airspace of the U.S. For this purpose, Buyer and Seller acknowledge that the territorial seas of the U.S. extend to twelve (12) nautical miles from the baseline of the country determined in accordance with the 1982 United Nations Convention of the Law of the Sea.

## 4.    BUYER'S PROPERTY.

(a)    Unless otherwise agreed in writing, all tangible and intangible property, including, but not limited to, information or data of any description, tools, materials, drawings, computer software, know-how, documents, trademarks, copyrights, equipment or material furnished to Seller by Buyer or specifically paid for by Buyer separately and not as part of the price of the goods, and any replacement

thereof, or any materials affixed or attached thereto, shall be and remain Buyer's personal property. Such property furnished by Buyer shall be accepted by Seller "AS IS" with all faults and without any warranty whatsoever, express or implied. Seller shall use such property at its own risk, and Buyer makes no warranty or representation concerning the condition of such property. Such property and, whenever practical, each individual item thereof, shall be plainly marked or otherwise adequately identified by Seller as Buyer's property, safely stored separate and apart from Seller's property and properly maintained by Seller. Seller further agrees to comply with any handling and storage requirements provided by Buyer for such property. Seller shall not substitute any other property for Buyer's property. Seller will inspect Buyer's property prior to use and will train and supervise its employees and other authorized users of such property in its proper and safe operation. Seller shall use Buyer's property only to meet Buyer's orders, and shall not use it, disclose it to others or reproduce it for any other purpose. Such property, while in Seller's care, custody or control, shall be held at Seller's risk, shall be kept free of encumbrances and insured by Seller at Seller's expense in an amount equal to the replacement cost thereof with loss payable to Buyer and shall be subject to removal at Buyer's written request, in which event Seller shall prepare such property for shipment and redeliver to Buyer in the same condition as originally received by Seller, reasonable wear and tear excepted, all at Seller's expense. As noted in Section 15.4(b), "Assists", any consigned material, tooling or technology used in production of the goods shall be identified on the commercial or *pro forma* invoice used for international shipments. Buyer hereby grants a non-exclusive, non-assignable license, which is revocable with or without cause at any time, to Seller to use any information, drawings, specifications, computer software, know-how and other data furnished or paid for by Buyer hereunder for the sole purpose of performing this Order for Buyer.

(b)    Each party shall retain ownership of all Confidential Information and intellectual property it had prior to entering into the Supply Agreement or entering into any Order, which for Seller includes Seller's intellectual property in its manufacturing technology, processes, and manufacturing data, in any designs developed by Seller to meet Buyer's specifications, and in all improvements related thereto. Except as otherwise provided herein, should either party have any intellectual property that such party wants to incorporate into the other party's design, the parties will negotiate and enter into a development agreement or license agreement governing the use of such intellectual property.

**5.    DRAWINGS.** Any review or approval of drawings by Buyer will be for Seller's convenience and will not relieve Seller of its responsibility to meet all requirements of this Order.

**6.    CHANGES.**

6.1    Buyer may at any time make changes within the general scope of this Order in any one or more of the following: (a) drawings, designs or specifications where the goods to be furnished are to be specially manufactured for Buyer; (b) method of shipment or packing; (c) place and time of delivery; (d) amount of Buyer's furnished property; (e) quality; (f) quantity; or (g) scope or schedule of goods and/or services. Buyer shall document such change request in writing, and Seller shall not proceed to implement any change unless and until such change is provided in writing by Buyer. If any changes cause an increase or decrease in the cost of, or the time required for the performance of, any work under this Order, an equitable adjustment shall be made in the Order price or delivery schedule, or both, in writing. Any Seller claim for adjustment under this clause will be deemed waived unless asserted within thirty (30) days from Seller's receipt of the change or suspension notification, and may only include reasonable, direct costs that will necessarily be incurred as a direct result of the change.

6.2    Seller shall notify Buyer in writing in advance of any and all: (a) changes to the goods and/or services, their specifications and/or composition; (b) process changes; (c) plant and/or equipment/tooling changes or moves; (d) transfer of any work hereunder to another site; and/or (e) sub-supplier changes, and no such change shall occur until Buyer has had the opportunity to conduct such audits, surveys and/or testing necessary to determine the impact of such change on the goods and/or services and has approved such change in writing. Seller shall be responsible for obtaining, completing and submitting proper documentation regarding any and all changes, including complying with any written change procedures issued by Buyer.

**7.    PLANT ACCESS/INSPECTION AND QUALITY.**

7.1    *Inspection/Testing.* In order to assess Seller's work quality, conformance with Buyer's specifications and compliance with this Order, including but not limited to Seller's representations, warranties, certifications and covenants under this Order, upon reasonable notice by Buyer, all: (a) goods, materials and services related in any way to the goods and services purchased hereunder (including without limitation raw materials, components, intermediate assemblies, work in process, tools and end products) shall be subject to inspection and test by Buyer and its customer or representative, provided, however, that the customer or representative has signed a non-disclosure agreement with Seller, at all times and places, including sites where the goods and services are created or performed, whether they are at premises of Seller, Seller's suppliers or elsewhere; and (b) of Seller's books and records relating to this Order shall be subject to inspection by Buyer. If any inspection, test, audit or similar oversight activity is made on Seller's or its suppliers' premises, Seller shall, without additional charge: (i) provide all reasonable access and assistance for the safety and convenience of the inspectors and (ii) take all necessary precautions and implement appropriate safety procedures for the safety of Buyer's personnel while they are present on such premises. If Buyer's personnel require medical attention on such premises, Seller will arrange for appropriate attention. If in Buyer's opinion the safety of its personnel on such premises may be imperiled by local conditions, Buyer may remove some or all of its personnel from such premises, and Buyer shall have no responsibility for any resulting impact on Seller or its suppliers. If specific Buyer and/or Buyer's customer tests, inspection and/or witness points are included in this Order, the goods shall not be shipped without an inspector's release or a written waiver of test/inspection/witness with respect to each such point; however, Buyer shall not be permitted to unreasonably delay shipment; and Seller shall notify Buyer in writing at least twenty (20) days prior to each of Seller's scheduled final and, if applicable, intermediate test/inspection/witness points. Buyer's failure to inspect, accept, reject or detect defects by inspection

12



shall neither relieve Seller from responsibility for such goods or services that are not in accordance with the Order requirements nor impose liabilities on Buyer.

7.2     *Quality*. When requested by Buyer, Seller shall promptly submit real time production and process measurement and control data (the "Quality Data") in the form and manner requested by Buyer. Seller shall provide and maintain an inspection, testing and process control system ("Seller's Quality System") covering the goods and services provided hereunder that is acceptable to Buyer and its customer and complies with Buyer's quality policy and/or other quality requirements that are set forth on the face of this Order or are otherwise agreed to in writing by the parties ("Quality Requirements"). Acceptance of Seller's Quality System by Buyer shall not alter the obligations and liability of Seller under this Order. If Seller's Quality System fails to comply with the terms of this Order, Buyer may require additional quality assurance measures at Seller's expense. Such measures may include, but are not limited to, Buyer requiring Seller to install a Buyer-approved third party quality auditor(s)/inspector(s) at Seller's facility(ies) to address the deficiencies in Seller's Quality System or other measures that may be specified in Buyer's Quality Requirements or otherwise agreed upon by the parties in writing. Seller shall keep complete records relating to Seller's Quality System and shall make such records available to Buyer and its customer for: (a) three (3) years after completion of this Order; (b) such period as set forth in the specifications applicable to this Order; or (c) such period as required by applicable law, whichever period is the longest.

7.3     *Product Recall*.

(a)     If any governmental agency with jurisdiction over the recall of any goods supplied hereunder provides written notice to Buyer or Seller, or Buyer or Seller has a reasonable basis to conclude, that any goods supplied hereunder could possibly create a potential safety hazard or unsafe condition, pose an unreasonable risk of serious injury or death, contain a serial defect or a material quality or performance deficiency, or are not in compliance with any applicable code, standard or legal requirement so as to make it necessary, that such goods be recalled and/or repaired, Seller or Buyer will promptly communicate such relevant facts to each other. Buyer and Seller shall mutually determine whether a recall of the affected goods is necessary, unless Buyer or Seller has received notice to that effect from any governmental agency with jurisdiction over the recalled goods, with such mutual agreement to be reached by the good faith efforts of Buyer and Seller, with neither Buyer nor Seller unreasonably withholding agreement regarding such determination.     In case the agreement regarding such determination is not reached by the parties within 30 days, the parties will mutually select an independent third party to determine if a recall of the affected goods is necessary. The decision of the independent third party is to be accepted by both Parties.

(b)     If a recall is required under the law or Buyer and Seller or an independent third party determine that it is necessary, Seller shall promptly develop a corrective action plan(s) (collectively, the "Corrective Action Plan"), which shall include all actions required by any applicable consumer protection or similar law and any applicable regulations and provide Buyer with an opportunity to review and approve such plan, such approval not to be unreasonably withheld by Buyer. Seller and Buyer agree to cooperate and work together to ensure that such plan is acceptable to both parties prior to its implementation. If Buyer does not respond to Seller regarding its review and approval of such Corrective Action Plan within a reasonable time period, Buyer shall be deemed to have approved such plan. In addition, Buyer shall cooperate with and assist Seller in any corrective actions and/or filings; provided, however, that nothing contained in this Section shall preclude Buyer from taking any action or making any filings, and in such event, Seller shall cooperate with and assist Buyer in any corrective actions and/or filings it undertakes.

(c)     To the extent such recall is determined to have been caused by a defect, quality or performance deficiency, other deficiency, non-conformance or non-compliance, which is the responsibility of Seller, at Buyer's election, Seller shall perform all necessary repairs or modifications at its sole expense, or Buyer shall perform such necessary repairs or modifications and Seller shall reimburse Buyer for all reasonable out-of-pocket costs and expenses incurred by Buyer in connection therewith. In either case, Seller shall reimburse Buyer for all reasonable out-of-pocket costs and expenses incurred by Buyer in connection with any recall, repair, replacement or refund program, including without limitation all costs related to: (i) investigating and/or inspecting the affected goods; (ii) locating, identifying and notifying Buyer's customers; (iii) repairing, or where repair of the goods is impracticable or impossible, repurchasing or replacing the recalled goods; (iv) packing and shipping the recalled goods; and (v) media notification, if such form of notifications is needed or required. Each party shall consult the other before making any statements to the public or a governmental agency relating to potential safety hazards affecting the goods, except where such consultation would prevent timely notification required by law.

**8.     REJECTION.** If any of the goods and/or services furnished pursuant to this Order are found within thirty (30) days after delivery to be defective or otherwise not in conformity with the requirements of this Order, including any applicable drawings and specifications, whether such defect or non-conformity relates to scope provided by Seller or a direct or indirect supplier to Seller, then Buyer, in addition to any other rights, remedies and choices it may have by law, contract or at equity, and in addition to seeking recovery of any and all damages and costs emanating therefrom, at its option and sole discretion and at Seller's expense may: (a) require Seller to immediately re-perform any defective portion of the services and/or require Seller to immediately repair or replace non-conforming goods with goods that conform to all requirements of this Order; (b) take such actions as may be required to cure all defects and/or bring the goods and/or services into conformity with all requirements of this Order, in which event, all related costs and expenses (including, but not limited to, material, labor and handling costs and any required re-performance of value added machining or other service) and other reasonable charges shall be for Seller's account; (c) withhold total or partial payment; (d) reject and return all or any portion of such goods and/or services; and/or (e) rescind this Order without liability. For any repairs or replacements, Seller, at its sole cost and expense, shall perform any tests requested by Buyer to verify conformance to this Order.

**9. WARRANTIES.**



9.1    Seller warrants that all goods and services provided pursuant to this Order, whether provided by Seller or a direct or indirect supplier of Seller, will be: (a) free of any claims of any nature, including without limitation title claims, and Seller will cause any lien or encumbrance asserted to be discharged, at its sole cost and expense, within thirty (30) days of its assertion (provided such liens do not arise out of Buyer's failure to pay amounts not in dispute under this Order or an act or omission of Buyer); (b) new and of merchantable quality not used, rebuilt or made of refurbished material unless approved in writing by Buyer; (c) free from all defects in workmanship and material; and (d) provided in strict accordance with all specifications, samples, drawings, designs, descriptions or other requirements as described in the qualification documentation and qualification process approved or adopted by Buyer and any subsequent changes made by Buyer thereto.  For all goods that were designed by Seller and built to Buyer's specifications pursuant to this Order, Seller provides all the warranties in subsections (a) through (d) above, and Seller also warrants that such goods were designed by Seller to meet Buyer's specifications.  Seller further warrants that all services will be performed in a competent and professional manner in accordance with good and prudent standards and of Supplier's industry.  Any attempt by Seller to limit, disclaim or restrict any such warranties or remedies by acknowledgment or otherwise shall be null, void and ineffective.

9.2    The foregoing warranties shall in the case of wind turbine related goods and services apply for a period of: (i) twenty four (24) months from the Date of Commercial Operation (defined below) of the wind turbine which Buyer supplies to its customer; or (ii) forty-eight (48) months from the date of original delivery of the goods to Buyer or the performance of the services plus any time associated with delays such as those due to non-conforming goods and services until the final date of delivery of the goods at Buyer's final destination or the final date of the performance of the services, whichever occurs first.  "Date of Commercial Operation" means the date on which the wind turbine has successfully passed all performance and operational tests required by Buyer's customer for commercial operation.  The warranties shall apply to Buyer, its successors, and assigns.  Buyer shall provide Seller with written notice of any warranty claim, which shall include documentation regarding Date of Commercial Operation, if applicable.

9.3    If any of the goods or services are found to be defective or non-conforming, which in each case means not meeting the warranties set forth in Section 9.1 above during the warranty period, then, Buyer, in addition to any other rights, remedies and choices it may have by law, contract or at equity, and in addition to seeking recovery of any and all direct damages and costs emanating therefrom, at its option and sole discretion and at Seller's expense may: (a) require Seller to inspect, ship and repair or replace/reperform nonconforming or defective goods and/or services with goods and/or services that conform to all requirements of this Order; (b) take such actions as may be required to cure all defects and/or bring the goods and/or services into conformity with all requirements of this Order, in which event all related reasonable costs and expenses (including, but not limited to, material, labor and handling costs and any required reperformance of value added machining or other service) and other reasonable charges shall be for Seller's account and/or (c) return all or portion of such goods and in the case of such returned goods and/or in relationship to defective services that Buyer elects not to be re-performed receive a full refund of the purchase price.  Notwithstanding the foregoing Buyer shall exercise option (a) in the previous sentence prior to exercising options (b) or (c).  In all instances (a), (b) and (c) Seller shall be responsible for all direct damages, costs and expenses emanating from the defective or nonconforming goods or services, including without limitation, all installation and removal costs. Any repaired or replaced good, or part thereof, or reperformed services shall carry warranties on the same terms as set forth above, with the warranty period being the greater of the original unexpired warranty or eighteen (18) months after repair or replacement.  To determine if a defective or nonconforming good is not in conformity with Seller's warranty obligations under Section 9.1 (c) and (d), Seller will conduct a root cause analysis ("RCA") with Buyer's cooperation, unless the cause of such defect or nonconformity is apparent or a prior RCA has been conducted on the same or similar defect or nonconformity.  Buyer may also conduct its own RCA.  Seller will supply Buyer with such additional technical information and drawings of Seller as is reasonably necessary to conduct its RCA; provided, however, that all such additional technical information and drawings, which have not been disclosed to Buyer previously, will be kept confidential as provided in Section 16 below, will be used by Buyer only to conduct the RCA and, unlike other Confidential Information of Seller pursuant to Section 16, will not be disclosed to third parties without Seller's consent, which shall not be unreasonably withheld. In the event that Buyer and Seller disagree about the results of the RCA, a third party expert reasonably acceptable to both parties will be used to provide the RCA.  Without in any way limiting Seller's warranty obligations under this Section 9, any costs and expenses that Buyer may have occurred prior to the conclusion of the RCA, provided that such RCA determines that defective or nonconformity are within Seller's warranty obligations, such costs and expenses shall be for Seller's account and promptly be reimbursed to Buyer. Notwithstanding the foregoing, in the event that the defective or nonconforming good exhibits the same or similar defect or nonconformity as a prior defective or nonconforming good which was the subject of a prior RCA (a "Serial Defect"), the previous RCA, for such defect or nonconformity shall be determinative and in such event  Seller shall replace the defective or nonconforming goods irrespective of whether the goods actually exhibit the nonconformity or defect and be responsible for all direct damages, costs and expenses emanating from the defective or nonconforming goods, including without limitation, all installation and removal costs.  Buyer shall substantiate all costs claimed under Section 9.3 and shall use reasonable efforts to mitigate all such costs to the extent practicable.

In no event shall Seller be obligated under this warranty for (i) for goods that have been improperly installed or maintained and the cause of such defect or nonconformity is attributable to such improper installation or maintenance; and (ii) any defects or deficiencies in the goods that result from the operation of the goods outside the operating parameters set forth in Buyer's specification.  EXCEPT FOR THE WARRANTIES SET FORTH IN THIS SECTION 9, IN THIS ORDER OR IN THE SUPPLY AGREEMENT, SELLER MAKES NO OTHER WARRANTIES EITHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTY FITNESS FOR A PARICULAR PURPOSE.

**10.    SUSPENSION.** Buyer may at any time, by notice to Seller, suspend performance of the work for such time as it deems appropriate.  Upon receiving notice of suspension, Seller shall promptly suspend work to the extent specified, properly caring for and protecting all work in progress and materials, supplies and equipment Seller has on hand for performance.  Upon Buyer's request, Seller

14

shall promptly deliver to Buyer copies of outstanding purchase orders and subcontracts for materials, equipment and/or services for the work and take such action relative to such purchase orders and subcontracts as Buyer may direct. Buyer may at any time withdraw the suspension as to all or part of the suspended work by written notice specifying the effective date and scope of withdrawal. Seller shall resume diligent performance on the specified effective date of withdrawal. All claims for increase or decrease in the cost of or the time required for the performance of any work caused by suspension shall be pursued pursuant to, and consistent with, Section 6.1.

## 11.    TERMINATION.

11.1    *Termination for Convenience.*  Buyer may terminate all or any part of this Order at any time by written notice to Seller. Upon termination (other than due to Seller's insolvency or default including failure to comply with this Order), Buyer and Seller shall negotiate reasonable termination costs consistent with costs allowable under Section 6.1 and identified by Seller within thirty (30) days of Buyer's termination notice to Seller, unless the parties have agreed to a termination schedule in writing.

11.2    *Termination for Default.*  Except for delay due to causes beyond the control and without the fault or negligence of Seller and all of its suppliers (lasting not more than sixty (60) days), Buyer, without liability, may by written notice of default, terminate the whole or any part of this Order if Seller:  (a) fails to perform within the time specified or in any written extension granted by Buyer, provided however, for delay in delivery, Buyer's right to terminate shall be subject to the close of the agreed delay period in Section 6 of the Supply Agreement; (b) fails to make progress which, in Buyer's reasonable judgment, endangers performance of this Order in accordance with its terms; or (c) fails to comply with any of the terms of this Order. Such termination shall become effective if Seller does not cure such failure within fifteen (15) days of receiving notice of default. Upon termination, Buyer may procure at Seller's expense and upon terms it deems appropriate, goods or services similar to those so terminated. Seller shall continue performance of this Order to the extent not terminated and shall be liable to Buyer for any excess costs for such similar goods or services. As an alternate remedy and in lieu of termination for default, Buyer, at its sole discretion, may elect to extend the delivery schedule and/or waive other deficiencies in Seller's performance, making Seller liable for any costs, expenses or damages arising from any failure of Seller's performance. If Seller for any reason anticipates difficulty in complying with the required delivery date, or in meeting any of the other requirements of this Order, Seller shall promptly notify Buyer in writing. If Seller does not comply with Buyer's delivery schedule, Buyer may require delivery by fastest method and charges resulting from the premium transportation must be fully prepaid by Seller. Buyer's rights and remedies in this clause are in addition to any other rights and remedies provided by law or equity or under this Order.

11.3    *Termination for Insolvency/Prolonged Delay.*  If Seller ceases to conduct its operations in the normal course of business or fails to meet its obligations as they mature or if any proceeding under the bankruptcy or insolvency laws is brought by or against Seller, a receiver for Seller is appointed or applied for, an assignment for the benefit of creditors is made or an excused delay (or the aggregate time of multiple excused delays) lasts more than sixty (60) days, Buyer may immediately terminate this Order without liability, except for goods or services completed, delivered and accepted within a reasonable period after termination (which will be paid for at the Order price).

11.4    *Obligations on Termination.*  Unless otherwise directed by Buyer, upon completion of this Order or after receipt of a notice of termination of this Order for any reason, Seller shall immediately:  (a) stop work as directed in the notice; (b) place no further subcontracts or purchase orders for materials, services or facilities hereunder, except as necessary to complete any continued portion of this Order; and (c) terminate all subcontracts to the extent they relate to work terminated. Promptly after termination of this Order and unless otherwise directed by Buyer, Seller shall deliver to Buyer all completed work, work in process, including all designs, drawings, specifications, other documentation and material required or produced in connection with such work and all of Buyer's Confidential Information as defined in Section 16.

## 12.    INDEMNITY AND INSURANCE.

12.1    *Indemnity.*  Seller shall defend, indemnify, release and hold harmless Buyer, its Affiliates and its or their directors, officers, employees, agents representatives, successors and assigns, whether acting in the course of their employment or otherwise, against any and all suits, actions, or proceedings, at law or in equity, and from any and all claims, demands, losses, judgments, fines, penalties, damages, costs, expenses, or liabilities (including without limitation claims for personal injury, death, or property or environmental damage, claims or damages payable to customers of Buyer, and breaches of Sections 15 and/or 16 below) arising from any negligent or willful act or omission arising out of or related to this Order by Seller, its agents, employees, or subcontractors, except to the extent attributable to the negligence or willful misconduct of Buyer. Seller agrees to include a clause substantially similar to the preceding clause in all subcontracts it enters into related to its fulfillment of this Order.

12.2    *Insurance.*  For the duration of this Order and for period of ten (10) years from the date of delivery of the goods or performance of the services, Seller shall maintain, through insurers with a minimum Best rating of A- VII or S&P A and licensed in the jurisdiction where goods are manufactured and/or sold and where services are performed, the following insurance: (a) Commercial General Liability, on an occurrence form, in the minimum amount of USD $5,000,000 per occurrence with coverage for: (i) bodily injury/property damage, including coverage for contractual liability insuring the liabilities assumed in this Order; (ii) products/completed operations liability; and (iii) all of the following types of coverages where applicable: (A) contractors protective liability; (B) collapse or structural injury; and/or (C) damage to underground utilities with all such coverages in this Section 12.2(a) applying on a primary basis, providing for cross liability, not being subject to any self-insured retention and being endorsed to name General Electric Company, its Affiliates (defined in Section 2.2(c)), directors, officers, agents and employees (collectively, the "GE Parties") as additional insureds; (b) Business Automobile Liability Insurance covering all owned, hired and non-owned vehicles used in the performance of the Order in the amount of

15

USD $5,000,000 combined single limit each occurrence, endorsed to name the GE Parties as additional insureds; (c) Employers' Liability in the amount of USD $5,000,000 each occurrence; (d) Property Insurance on an "All-risk" basis covering the full replacement cost value of all property owned, rented or leased by Seller in connection with this Order and covering damage to Buyer's property in Seller's care, custody and control, with such policy being endorsed to name Buyer as "Loss Payee" relative to its property in Seller's care, custody and control; and (e) appropriate Workers' Compensation Insurance protecting Seller from all claims under any applicable Workers' Compensation and Occupational Disease Act. Seller shall obtain coverage similar to Workers' Compensation and Employers' Liability for each Seller employee performing work under this Order outside of the U.S. All insurance specified in this Section shall be endorsed to provide a waiver of subrogation in favor of Buyer, its Affiliates (defined in Section 2.2(c)) and its and their respective employees for all losses and damages covered by the insurances required in this Section. The application and payment of any self-insured retention or deductible on any policy carried by Seller shall be the sole responsibility of Seller. Should Buyer be called upon to satisfy any self-insured retention or deductible under Seller's policies, Buyer may seek indemnification or reimbursement from Seller where allowable by law. Upon request by Buyer, Seller shall provide Buyer with a certificate(s) of insurance evidencing that the required minimum insurance is in effect. The certificate(s) of insurance shall reference that the required coverage extensions are included on the required policies and state that: "General Electric Company, its subsidiaries, affiliates, directors, officers, agents and employees shall be named as additional insureds". Copies of endorsements evidencing the required additional insured status, waiver of subrogation provision and/or loss payee status shall be attached to the certificate(s) of insurance. Buyer shall have no obligation to examine such certificate(s) or to advise Seller in the event its insurance is not in compliance herewith. Acceptance of such certificate(s), which are not compliant with the stipulated coverages, shall in no way whatsoever imply that Buyer has waived its insurance requirements.

**13.    ASSIGNMENT AND SUBCONTRACTING.** Seller may not assign (including by change of ownership or control, by operation of law or otherwise) this Order or any interest herein including payment, without Buyer's prior written consent. Seller shall not subcontract or delegate performance of all or any substantial part of the work called for under this Order without Buyer's prior written consent. Any assignee of Seller shall be bound by the terms and conditions of this Order. Should Buyer grant consent to Seller's assignment, Seller will ensure that such assignee shall be bound by the terms and conditions of this Order. Further, Seller shall advise Buyer of any subcontractor or supplier to Seller: (a) that will have at its facility any parts or components with Buyer's or any of its Affiliates' name, logo or trademark (or that will be responsible to affix the same); and/or (b) fifty percent (50%) or more of whose output from a specific location is purchased directly or indirectly by Buyer. In addition, Seller will obtain for Buyer, unless advised to the contrary in writing, written acknowledgement by such assignee, subcontractor and/or supplier to Seller of its commitment to act in a manner consistent with Buyer's integrity policies, and to submit to, from time to time, on-site inspections or audits by Buyer or Buyer's third party designee as requested by Buyer. If Seller subcontracts any part of the work under this Order outside of the final destination country where the goods purchased hereunder will be shipped, Seller shall be responsible for complying with all customs requirements related to such sub-contracts, unless otherwise set forth in this Order.

**14.    PROPER BUSINESS PRACTICES.** Seller shall act in a manner consistent with Buyer's *Integrity Guide for Suppliers, Contractors and Consultants*, a copy of which has been provided to Seller, all laws concerning improper or illegal payments and gifts or gratuities and agrees not to pay, promise to pay or authorize the payment of any money or anything of value, directly or indirectly, to any person for the purpose of illegally or improperly inducing a decision or obtaining or retaining business in connection with this Order. Further, in the execution of its obligations under this Order, Seller shall take the necessary precautions to prevent any injury to persons or to property.

**15.    COMPLIANCE WITH LAWS.**

15.1    *General.* Seller represents, warrants, certifies and covenants ("Covenants") that it will comply with all: (a) laws applicable to the goods, services and/or the activities contemplated or provided under this Order, including, but not limited to, any national, international, federal, state, provincial or local law, treaty, convention, protocol, common law, regulation, directive or ordinance and all lawful orders, including judicial orders, rules and regulations issued thereunder, including without limitation those dealing with the environment, health and safety, employment, records retention, personal data protection and the transportation or storage of hazardous materials and (b) good industry practices, including the exercise of that degree of skill, diligence, prudence and foresight, which can reasonably be expected from a competent Seller who is engaged in the same type of service or manufacture under similar circumstances. As used in this Order, the term "hazardous materials" shall mean any substance or material defined as a hazardous material, hazardous substance, toxic substance, pesticide or dangerous good under 49 CFR 171.8 or any other substance regulated on the basis of potential impact to safety, health or the environment pursuant to an applicable requirement of any entity with jurisdiction over the activities, goods or services, which are subject to this Order. Seller agrees to cooperate fully with Buyer's audit and/or inspection efforts (including completing and returning questionnaires) intended to verify Seller's compliance with Sections 14 and/or 15 of this Order. Seller further agrees at Buyer's request to provide certificates relating to any applicable legal requirements or to update any and all of the representations, warranties, certifications and covenants under this Order in form and substance satisfactory to Buyer. Buyer shall have the right to audit all pertinent records of Seller, and to make reasonable inspections of Seller facilities, to verify compliance with this Section 15.

16

15.2   *Environment, Health and Safety.*

(a)   <u>General.</u>  Seller Covenants that it will take appropriate actions necessary to protect health, safety and the environment, including, without limitation, in the workplace and during transport and has established an effective program to ensure any suppliers it uses to perform the work called for under this Order will be in compliance with Section 15 of this Order.

(b)   <u>Material Suitability.</u>  Seller Covenants that each chemical substance constituting or contained in goods sold or otherwise transferred to Buyer is suitable for use and/or transport in any jurisdiction to or through which Buyer informs Seller the goods will likely be shipped or to or through which Seller otherwise has knowledge that shipment will likely occur and is listed on or in:  (i) the list of chemical substances compiled and published by the Administrator of the U.S. Environmental Protection Agency pursuant to the U.S. Toxic Substances Control Act ("TSCA") (15 U.S.C. § 2601), otherwise known as the TSCA Inventory, or exempted from such list under 40 CFR 720.30-38; (ii) the Federal Hazardous Substances Act (P.L. 92-516) as amended; (iii) the European Inventory of Existing Commercial Chemical Substances ("EINECS") as amended; (iv) the European List of Notified Chemical Substances ("ELINCS") and lawful standards and regulations thereunder; or (v) any equivalent or similar lists in any other jurisdiction to or through which Buyer informs Seller the goods will likely be shipped or to or through which Seller otherwise has knowledge that shipment will likely occur.

(c)   <u>Material Registration and Other Documentation.</u>  Seller Covenants that each chemical substance constituting or contained in goods sold or otherwise transferred to Buyer:  (i) is properly documented and/or registered as required in the jurisdiction to or through which Buyer informs Seller the goods will likely be shipped or to or through which Seller otherwise has knowledge that shipment will likely occur, including but not limited to pre-registration and registration if required, under Regulation (EC) No. 1907/2006 ("REACH"); (ii) is not restricted under Annex XVII of REACH; and (iii) if subject to authorization under REACH, is authorized for Buyer's use.  In each case, Seller will timely provide Buyer with supporting documentation, including without limitation, (A) pre-registration numbers for each substance; (B) the exact weight by weight percentage of any REACH Candidate List (defined below) substance constituting or contained in the goods; (C) all relevant information that Buyer needs to meet its obligations under REACH to communicate safe use to its customers; and (D) the documentation of the authorization for Buyer's use of an Annex XIV substance.  Seller shall notify Buyer if it decides not to register substances that are subject to registration under REACH and are constituting or contained in goods supplied to Buyer at least twelve (12) months before their registration deadline.  Seller will monitor the publication by the European Chemicals Agency of the list of substances meeting the criteria for authorization under REACH (the "Candidate List") and immediately notify Buyer if any of the goods supplied to Buyer contain a substance officially proposed for listing on the Candidate List.  Seller shall provide Buyer with the name of the substance as well as with sufficient information to allow Buyer to safely use the goods or fulfill its own obligations under REACH.

(d)   <u>Restricted Materials.</u>  Seller Covenants that none of the goods sold or transferred to Buyer contain any:  (i) of the following chemicals:  arsenic, asbestos, benzene, beryllium, carbon tetrachloride, cyanide, lead or lead compounds, cadmium or cadmium compounds, hexavalent chromium, mercury or mercury compounds, trichloroethylene, tetrachloroethylene, methyl chloroform, polychlorinated biphenyls ("PCBs"), polybrominated biphenyls ("PBBs"), polybrominated diphenyl ethers ("PBDEs"); (ii) chemical or hazardous material otherwise prohibited pursuant to Section 6 of TSCA; (iii) chemical or hazardous material otherwise restricted pursuant to EU Directive 2002/95/EC (27 January 2003) (the "ROHS Directive"); (iv) designated ozone depleting chemicals as restricted under the Montreal Protocol (including, without limitation, 1,1,1 trichloroethane, carbon tetrachloride, Halon-1211, 1301, and 2402, and chlorofluorocarbons ("CFCs") 11-13, 111-115, 211-217); (v) substance listed on the REACH Candidate List, subject to authorization and listed on Annex XIV of REACH, or restricted under Directive 76/769/EEC and when it shall be repealed, Annex XVII of REACH; or (vi) other chemical or hazardous material the use of which is restricted in any other jurisdiction to or through which Buyer informs Seller the goods are likely to be shipped or to or through which Seller otherwise has knowledge that shipment will likely occur, unless with regard to all of the foregoing, Buyer expressly agrees in writing and Seller identifies an applicable exception from any relevant legal restriction on the inclusion of such chemicals or hazardous materials in the goods sold or transferred to Buyer.  Upon request from Buyer and subject to reasonable confidentiality provisions which enable Buyer to meet its compliance obligations, Seller will provide Buyer with the chemical composition, including proportions, of any substance, preparation, mixture, alloy or goods supplied under this Order and any other relevant information or data regarding the properties including without limitation test data and hazard information.

(e)   <u>Take-back of Electrical and Electronic Components, Including Batteries or Accumulators.</u>  Seller Covenants that, except as specifically listed on the face of this Order or in an applicable addendum, none of the goods supplied under this Order are electrical or electronic equipment or batteries or accumulators as defined by laws, codes or regulations of a jurisdiction to or through which Buyer informs Seller the goods are likely to be shipped or to or through which Seller otherwise has knowledge that shipment will likely occur, including but not limited to EU Directive 2002/96/EC (27 January 2003) (the "WEEE Directive"), as amended and EU Directive 2006/66/EC (26 September 2006) (the "Batteries Directive") and/or any other legislation providing for the taking back of such electrical or electronic equipment or batteries or accumulators (collectively, "Take-Back Legislation").  For any goods specifically listed on the face of this Order or in such addendum as electrical or electronic equipment or batteries or accumulators that are covered by any Take-Back Legislation and purchased by Buyer hereunder, Seller agrees to:  (i) assume responsibility for taking back such goods in the future upon the request of Buyer and treating or otherwise managing them in accordance with the requirements of the applicable Take-Back Legislation; (ii) take back as of the date of this Order any used goods currently owned by Buyer of the same class of such goods purchased by Buyer hereunder up to the number of new units being purchased by Buyer or to arrange with a third party to do so in accordance with all applicable requirements; and (iii) appropriately mark and/or label the goods as required by any applicable Take-Back Legislation.  Seller will not charge Buyer any additional amounts, and no additional payments will be due from Buyer for Seller's agreement to undertake these responsibilities.

17



(f)    CE Directives. Seller Covenants that all goods conform with applicable Conformité Européenne ("CE") directives for goods intended for use in the EU, including those regarding electrical/electronic devices, machinery and pressure vessels/equipment. Seller will affix the CE mark on goods as required. Seller will provide all documentation required by the applicable CE directives, including but not limited to Declarations of Conformity, Declarations of Incorporation, technical files and any documentation regarding interpretations of limitations or exclusions.

(g)    Nanoscale Material. With respect to any goods sold or otherwise transferred to Buyer hereunder, Seller shall notify Buyer in writing of the presence of any engineered nanoscale material (defined for these purposes as any substance with at least one dimension of such substance known to be less than one hundred (100) nanometers in length). With respect to all such nanoscale material(s), Seller shall provide a description of its regulatory status and any safety data or other notifications that are appropriate in the EU, U.S. and any other jurisdictions to which Buyer informs Seller the goods will be shipped or to which the Seller otherwise has knowledge that shipment will likely occur.

(h)    Labeling/Shipping Information. With respect to any goods or other materials sold or otherwise transferred to Buyer hereunder, Seller shall provide all relevant information, including without limitation, safety data sheets in the language and the legally required format of the location to which the goods will be shipped and mandated labeling information, required pursuant to applicable requirements such as: (i) the Occupational Safety and Health Act ("OSHA") regulations codified at 29 CFR 1910.1200; (ii) EU REACH Regulation (EC) No. 1907/2006, EU Regulation (EC) No. 1272/2008 classification, labeling and packaging of substances and mixtures ("CLP"), EU Directives 67/548/EEC and 1999/45/EC, as amended, if applicable, and (iii) any other applicable law, rule or regulation or any similar requirements in any other jurisdictions to or through which Buyer informs Seller the goods are likely to be shipped or through which Seller otherwise has knowledge that shipment will likely occur, such as U.S. Department of Transportation regulations governing the packaging, marking, shipping and documentation of hazardous materials, including hazardous materials specified pursuant to 49 CFR, the International Maritime Organization ("IMO") and the International Air Transport Association ("IATA").

15.3    *Subcontractor Flow-downs for U.S. Government Commercial Items Contracts.* Where the goods and/or services being procured by Buyer from Seller are in support of a U.S. Government end customer or an end customer funded in whole or part by the U.S. Government, Seller Covenants to comply with the terms of FAR 52.212-5(e) or 52.244-6 and DFARS 252.212-7001(c) or DFARS 252.244-7000 to the extent those terms are applicable to commercially available off-the-shelf ("COTS") items or commercial items and as appropriate for the dollar value of this Order. In addition, if this Order is in support of a project involving Rural Utility Service ("RUS") funds, then the following additional requirements apply: (a) Article VI, Section 4 of RUS Form 198, "Compliance with Laws", specifically the certification as to Debarment and Suspension set forth in 7 CFR part 3017; and (b) Article VI, Section 5 of RUS Form 198, "Equal Opportunity Provisions", including the requirements for Seller to provide a certification that Seller has filed a current report on Standard Form 100 and a Certificate of Non-segregated Facilities. The version of these clauses/provisions/requirements shall be those that are in effect as of the date of this Order.

15.4    *Import/Export.*

(a)    Packing List and *Pro Forma* Invoice. In all cases, Seller must provide to Buyer, a packing list containing all information specified in Section 19 below and a commercial or *pro forma* invoice. The commercial/*pro forma* invoice shall be in English or if requested by Buyer, the language of the destination country and shall include:  contact names and telephone numbers of representatives of Buyer and Seller who have knowledge of the transaction; Buyer's order number, order line item, release number (in the case of a "blanket order") and part number; detailed description of the merchandise; unit purchase price in the currency of the transaction; quantity; INCOTERM; the named location; "country of origin" of the goods as determined under applicable customs laws, and the appropriate export classification code for each item as determined by the law of the exporting country (for example, for exports from the U.S., Seller shall provide the U.S. Commerce Department's Export Control Classification Number).

(b)    Assists. All goods and/or services provided by Buyer to Seller for the production of goods and/or services delivered under this Order, which are not included in the purchase price of the goods and/or services delivered by Seller, shall be separately identified on the invoice (i.e., consigned material, tooling, etc.). Each invoice shall also include the applicable Order number or other reference information for any consigned goods and shall identify any discounts or rebates from the base price used in determining the invoice value.

(c)    Importer of Record and Drawback. If goods are to be delivered DDP (INCOTERMS 2010) to the destination country, Seller agrees that Buyer will not be a party to the importation of the goods, that the transaction(s) represented by this Order will be consummated after importation and that Seller will neither cause nor permit Buyer's name to be shown as "Importer of Record" on any customs declaration. Seller also confirms that it has non-resident importation rights, if necessary, into the destination country and knowledge of the necessary import laws. If Seller is the importer of record for any goods, including any component parts thereof, associated with this Order, Seller shall provide Buyer with the customs documentation required by the country of import to allow Buyer to file for duty drawback and a copy of Seller's invoice. If Seller is the importer of record as set forth above into the U.S., such documentation shall include, but not be limited to, the following customs forms, which shall be properly executed: Customs Form 7552, "Certificate of Delivery" and Customs Form 7501, "Entry Summary".

(d)    Preferential Trade Agreements. If goods will be delivered to a destination country having a trade preferential or customs union agreement ("Trade Agreement") with Seller's country, Seller shall cooperate with Buyer to review the eligibility of the goods for any special program for Buyer's benefit and provide Buyer with any required documentation (e.g., NAFTA Certificate, EUR1 Certificate, GSP Declaration, FAD or other Certificate of Origin) to support the applicable special customs program (e.g., NAFTA, EEA, Lome

18

Convention, GSP, EU-Mexico FTA, EU/Mediterranean partnerships, etc.) to allow duty free or reduced duty for entry of goods into the destination country. Similarly, should any Trade Agreement or special customs program applicable to the scope of this Order exist at any time during the execution of the same and be of benefit to Buyer in Buyer's judgment, Seller shall cooperate with Buyer's efforts to realize any such available credits, including counter-trade or offset credit value which may result from this Order and acknowledges that such credits and benefits shall inure solely to Buyer's benefit. Seller shall indemnify Buyer for any costs, fines, penalties or charges arising from Seller's inaccurate documentation or untimely cooperation. Seller shall immediately notify Buyer of any known documentation errors and/or changes to the origin of goods. Failure of Supplier to comply with the requirements of this Section shall render Supplier liable for any resulting damage and/or expense incurred by Buyer.

(e)    Importer Security Filing. Seller shall provide Buyer or Buyer's designated agent in a timely fashion with all the data required to enable Buyer's compliance with the U.S. Customs' Importer Security Filing regulation, see 19 CFR Part 149 (the "ISF Rule") for all of Seller's ocean shipments of goods to Buyer destined for or passing through a U.S. port. Seller hereby Covenants to provide Buyer or Buyer's designated agent with accurate "Data Elements" as defined in and required by the ISF Rule in a timely fashion to ensure Buyer or Buyer's designated agent has sufficient opportunity to comply with its filing obligations thereunder.

(f)    Foreign Trade Zone. If Buyer and Seller agree to operate from a foreign trade zone ("FTZ"), any benefit arising from operation in such FTZ will inure to Buyer, and both parties will cooperate and adopt procedures designed to capture and maximize such benefit.

(g)    Anti-Dumping/Countervailing Duties. In the event that countervailing or anti-dumping duties are imposed that cannot be readily recovered from Seller, Buyer may terminate this Order with no further liability of any nature whatsoever to Seller hereunder. In the event that any jurisdiction imposes punitive or other additional tariffs on goods subject to this agreement in connection with a trade dispute or as a remedy in an "escape clause" action or for any other reason, Buyer may, at its option, treat such increase in duties as a condition of *force majeure*.

(h)    International Trade Controls. All transactions hereunder shall at all times be subject to and conditioned upon compliance with all applicable export control laws and regulations and any amendments thereto. The parties hereby agree that they shall not, except as said applicable laws and regulations may expressly permit, make any disposition by way of transshipment, re-export, diversion or otherwise, of any goods, technical data, or software, or the direct product thereof, furnished by either party in connection with this Order. The obligations of the parties to comply with all applicable export control laws and regulations shall survive any termination or discharge of any other contract obligations.

(i)    Suspension/Debarment and Trade Restrictions. Seller shall provide immediate notice to Buyer in the event of Seller being suspended, debarred or declared ineligible by any government entity or upon receipt of a notice of proposed debarment from any such entity during the performance of this Order. In the event that Seller is suspended, debarred or declared ineligible by any government entity, Buyer may terminate this Order immediately without liability to Buyer. In addition, subject to applicable law, Seller agrees that it will not supply any goods to Buyer under this Order that are sourced directly or indirectly from a: (i) government of a country defined by the U.S. State Department as a "State Sponsor of Terrorism" or "SST"; or (ii) company incorporated, formed or otherwise organized in a SST country or owned, in whole or in part, by the government of a SST country or a national of a SST country, regardless of where that company is located or doing business. In addition, Buyer may, from time-to-time and for business reasons, withdraw from and/or restrict its business dealings in certain jurisdictions, regions, territories and/or countries. Thus, subject to applicable law, Seller hereby agrees not to supply any goods to Buyer under this Order that are sourced directly or indirectly from any such jurisdiction, region, territory and/or country identified to Seller by Buyer, which currently includes, but is not limited to Myanmar (Burma) and North Korea.

15.5    *Miscellaneous.* Seller Covenants that, if applicable, it will comply with Section 211 of the Energy Reorganization Act, 10 CFR 50.7 (Employee Protection) and 29 CFR 24.2 (Obligations and Prohibited Acts), prohibiting discrimination against employees for engaging in "protected activities", which include reporting of nuclear safety or quality concerns, and Seller shall immediately inform Buyer of any alleged violations, notice of filing of a complaint or investigation related to any such allegation or complaint. Seller Covenants that no goods or services supplied under this Order have been or will be produced: (a) utilizing forced, indentured or convict labor; (b) utilizing the labor of persons younger than sixteen (16) years of age or in violation of the minimum working age law in the country of manufacture of the goods or performance of the services under this Order, whichever is higher; or (c) in violation of minimum wage, hours or days of service, or overtime laws in the country of manufacture or of the goods or performance of the services under this Order. If forced or prison labor, or labor below applicable minimum working age, is determined to have been used in connection with this Order, Buyer shall have the right to terminate this Order immediately without further compensation to Seller. To the extent Seller engages employees, representatives, contractors, subcontractors, agents and sub-agents (collectively, "Seller Personnel") to perform work under this Order in the U.S., Seller Covenants that for all such Seller Personnel it has completed an Employment Eligibility Verification (I-9) Form and all such Seller Personnel are lawfully residing in the U.S. and do not appear on the comprehensive list of terrorists and groups identified by Executive Order of the U.S. Government. To the extent Seller engages Seller Personnel to perform work under this Order outside of the U.S., Seller Covenants that it is in compliance with all applicable labor and employment laws, including but not limited to laws governing the authorization to work in the jurisdictions where such work is performed. Seller agrees to provide small business as well as minority and/or women-owned business utilization and demographic data upon request.

16.    **CONFIDENTIAL OR PROPRIETARY INFORMATION AND PUBLICITY.** Each party as the receiving party shall keep confidential any: (a) any other tangible or intangible property furnished by the other party as the disclosing party in connection with this Order, including any drawings, specifications, data, goods and/or information; (b) technical, process, proprietary or economic

information derived from drawings or 3D or other models owned or provided by the disclosing party; and (c) any other tangible or intangible property furnished by the disclosing party in connection with this Order, including any drawings, specifications, data, goods and/or information (the "Confidential Information") and shall not divulge, directly or indirectly, the Confidential Information for the benefit of any other party without the disclosing party's prior written consent. Confidential Information shall also include any notes, summaries, reports, analyses or other material derived by the receiving party in whole or in part from the Confidential Information in whatever form maintained (collectively, "Notes"). Except as required for the efficient performance of this Order, the receiving party shall not use or permit copies to be made of the Confidential Information without the disclosing party's prior written consent. If any such reproduction is made with prior written consent, notice referring to the foregoing requirements shall be provided thereon. The restrictions in this Section regarding the Confidential Information shall be inoperative as to particular portions of the Confidential Information disclosed by the disclosing party to the receiving party if such information: (i) is or becomes generally available to the public other than as a result of disclosure by the receiving party; (ii) was available on a non-confidential basis prior to its disclosure to the receiving party; (iii) is or becomes available to the receiving party on a non-confidential basis from a source other than the disclosing party when such source is not, to the best of the receiving party's knowledge, subject to a confidentiality obligation with the disclosing party; or (iv) was independently developed by the receiving party, without reference to the Confidential Information, and the receiving party can verify the development of such information by written documentation. Upon completion or termination of this Order, the receiving party shall promptly return to the disclosing party all Confidential Information, including any copies thereof, and shall destroy (with such destruction certified in writing by the receiving party) all Notes and any copies thereof except as otherwise provided herein. The receiving party shall not make any announcement, take or release any photographs (except for its internal operation purposes for the manufacture and assembly of the goods), or release any information concerning this Order or any part thereof or with respect to its business relationship with the disclosing party, to any third party, member of the public, press, business entity, or any official body except as required by applicable law, rule, injunction or administrative order without the disclosing party's prior written consent. Seller may disclose the Confidential Information to its Affiliates to the extent necessary to permit them to assist Seller in its performance of its obligations hereunder; provided that each such Affiliate is advised of the confidential nature of the Confidential Information and agrees to comply with the confidentiality restrictions in this Section 16. To the extent that an Affiliate of Buyer is needed to assist Buyer in performing its obligations under this Order and such Affiliate is not a "Buyer" under the Supply Agreement ("Non-purchasing Affiliate"), Buyer may disclose such Confidential Information to such Non-purchasing Affiliate if Buyer advises such Non-purchasing Affiliate of the confidential nature of such information, and the Non-purchasing Affiliate agrees to comply with the restrictions in this Section 16. Seller shall be responsible for any breach of the terms of this Section 16 by its Affiliates, and Buyer agrees to be responsible for any breach of the terms of this Section 16 its Non-purchasing Affiliate. Notwithstanding the terms in this Section 16, to the extent Buyer utilizes Seller's Confidential Information in developing, making, using, selling, servicing or maintaining Seller's goods in Buyer's products, Buyer may use, retain, and disclose to anyone who is not bearing or seal manufacturer, subject to the same restrictions and obligations of confidentiality that Buyer uses to protect its own Confidential Information, any Confidential Information received from Seller for such developing, making, using, selling, servicing or maintaining of Seller's goods in Buyer's products.

17.    **INTELLECTUAL PROPERTY INDEMNIFICATION.** Seller shall indemnify, defend and hold Buyer harmless from all costs and expenses related to any suit, claim or proceeding brought against Buyer based on a third party claim that (i) any manufacturing process used by Seller to produce the goods constitutes an infringement of any patent, copyright, trademark, trade secret or other intellectual property right of any third party; or (ii) any goods which have been designed by Seller to meet Buyer's specification constitutes an infringement of any patent, copyright, trademark, trade secret or other intellectual property right of any third party; provided, that any such infringement claim is not arising from Buyer's specifications, any modification of the goods by Buyer, or the combination or use of the goods with Buyer's application where the claim relates to such combination. In the event of any claim against Buyer for infringement hereunder, Seller, at its sole option, will have the right to select counsel of its choice, to make changes to the goods so that the goods will be noninfringing, to negotiate a settlement of any such claim, and/or defend Buyer in any litigation arising from such claim. Buyer shall notify Seller promptly of any such suit, claim or proceeding and give Seller authority, information, and assistance (at Seller's expense) for the defense of same, and Seller shall pay all damages and costs awarded therein. Notwithstanding the foregoing, any settlement of such suit, claim or proceeding shall be subject to Buyer's consent, such consent not to be unreasonably withheld. If the use of any goods which have been designed by Seller to meet Buyer's specifications are enjoined, Seller shall, at its own expense and at its option, either procure for Buyer the right to continue using said goods or replace same with a non-infringing equivalent.

18.    **SECURITY AND BUSINESS CONTINUITY MANAGEMENT POLICY; SUPPLY CHAIN SECURITY REQUIREMENTS.**

18.1    *Security and Business Continuity Management Policy.* Seller shall have and comply with a company security and business continuity management policy, which shall be revised and maintained proactively and as may be requested by Buyer ("Security and Business Continuity Management Policy"). The Security and Business Continuity Management Policy shall identify and require Seller's management and employees to take appropriate measures necessary to do the following:

(a)    provide for the physical security of the people working on Seller's premises and others working for or on behalf of Seller;

(b)    provide for the physical security of Seller's facilities and physical assets related to the performance of work, for Buyer or its Affiliates ("Work") including, in particular, the protection of Seller's mission critical equipment and assets;

(c)    protect software related to the performance of the Work from loss, misappropriation, corruption and/or other damage;

20

(d)     protect Buyer and/or its Affiliates' and Seller's drawings, technical data and other proprietary information related to the performance of the Work from loss, misappropriation, corruption and/or other damage;

(e)     provide for the prompt recovery, including through preparation, adoption and maintenance of a crisis management and disaster recovery plan, of facilities, physical assets, software, drawings, technical data, other intellectual property and/or the Seller's business operations in the event of a security breach, incident, crisis or other disruption in Seller's ability to use the necessary facilities, physical assets, software, drawings, technical data or other intellectual property and/or to continue its operations; and

(f)     ensure the physical integrity and security of all shipments against the unauthorized introduction of harmful or dangerous materials (such measures may include, but are not limited, physical security of manufacturing, packing and shipping areas; restrictions on access of unauthorized personnel to such areas; personnel screening; and maintenance of procedures to protect the integrity of shipments); and

(g)     report to Buyer all crises and/or supply chain security breaches and/or situations where illegal or suspicious activities relating to the Work are detected. In the event of such crisis, supply chain security breach and/or the detection of illegal or suspicious activity related to the Work, Seller shall contact Buyer's sourcing representative or the GE emergency hotline (U.S. toll-free +1 866-624-7202/direct dial from outside U.S. +1 518-385-3400) no later than twenty-four (24) hours after inception of the incident. At a minimum, the following details must be provided: (i) date and time of the incident; (ii) site/location of the incident; and (iii) incident description.

Buyer reserves the right to receive and review a physical or electronic copy of Seller's Security and Business Continuity Management Policy and to conduct on-site audits of Seller's facility and practices to determine whether such policy and Seller's implementation of such policy are reasonably sufficient to protect Buyer's property and/or interests. If Buyer reasonably determines that Seller's Security and Business Continuity Management Policy and/or such policy's implementation is/are insufficient to protect Buyer's property and/or interests, Buyer may give Seller notice of such determination. Upon receiving such notice, Seller shall have forty-five (45) days thereafter to make such policy changes and take the implementation actions reasonably requested by Buyer. Seller's failure to take such actions shall give Buyer the right to terminate this Order immediately without further compensation to Seller.

18.2     *Supply Chain Security.* The Customs-Trade Partnership Against Terrorism ("C-TPAT") program of the U.S. Customs and Border Protection, the Authorized Economic Operator for Security program of the European Union ("EU AEO") and similar World Customs Organization SAFE Framework of Standards (collectively, "SAFE Framework") programs are designed to improve the security of shipments in international trade. C-TPAT applies only to Sellers with non-U.S. locations that are involved in the manufacture, warehousing or shipment of goods to Buyer or to a customer or supplier of Buyer located in the U.S. EU AEO applies only to Sellers that are involved in the manufacture, warehousing or shipment of goods originating in, transported through or destined for the EU. Seller agrees that it will review the C-TPAT requirements for foreign manufacturers as outlined at: http://www.cbp.gov/xp/cgov/trade/cargo_security/ctpat/ctpat_application_material/ctpat_security_guidelines/ and the EU AEO and other SAFE Framework requirements appropriate for its business and that it will maintain and implement a written plan for security procedures in accordance with them as applicable ("Security Plan"). The Security Plan shall address security criteria such as: container security and inspection, physical access controls, personnel security, procedural security, security training and threat awareness, and information technology security. Upon request of Buyer, Seller shall:

(a)     certify to Buyer in writing that it has read the C-TPAT, EU AEO and/or other applicable SAFE Framework security criteria (collectively, the "Security Criteria"), maintains a written Security Plan consistent with such Security Criteria and has implemented appropriate procedures pursuant to such plan;

(b)     identify an individual contact responsible for Seller's facility, personnel and shipment security measures and provide such individual's name, title, address, email address and telephone and fax numbers to Buyer; and

(c)     inform Buyer of its C-TPAT, EU AEO and/or other applicable SAFE Framework membership status and any changes thereto including changes to certification and/or any notice of suspension or revocation.

Where Seller does not exercise control of manufacturing or transportation of goods destined for delivery to Buyer or its customers in international trade, Seller agrees to communicate the C-TPAT, EU AEO and/or other applicable SAFE Framework recommendations and/or requirements to its suppliers and transportation providers and condition its relationship with those entities upon their implementation of such recommendations and/or requirements. Further, upon advance notice by Buyer to Seller and during Seller's normal business hours, Seller shall make its facility available for inspection by Buyer's representative for the purpose of reviewing Seller's compliance with the C-TPAT, EU AEO and/or other applicable SAFE Framework security recommendations and/or requirements and with Seller's Security Plan. Each party shall bear its own costs in relation to such inspection and review. All other costs associated with Seller's development and implementation of Seller's Security Plan and C-TPAT, EU AEO and/or other applicable SAFE Framework compliance shall be borne by Seller.

**19.     PACKING, PRESERVATION AND MARKING.** Packing, preservation and marking will be in accordance with the specification drawing or as specified on the Order, or if not specified, the best commercially accepted practice will be used, which will be consistent with applicable law. All goods shall be packed in an appropriate manner, giving due consideration to the nature of the goods, with packaging suitable to protect the goods during transport from damage and otherwise to guarantee the integrity of the goods to destination. Goods that cannot be packed due to size or weight shall be loaded into suitable containers, pallets or crossbars thick enough to allow safe lifting and unloading. Vehicles that reach their destination and present unloading difficulties will be sent back to their point of departure. Seller shall place all markings in a conspicuous location as legibly, indelibly and permanently as the nature of the article or

container will permit. Each package shall bear Buyer's order number and be accompanied by a readily accessible packing list detailing the contents and including the following information on each shipment under this Order: Buyer's order number; case number; routing center number (if provided by Buyer's routing center); country of manufacture; destination shipping address; commodity description; gross/net weight in kilograms and pounds; dimensions in centimeters and inches; center of gravity for items greater than one (1) ton; precautionary marks (e.g., fragile, glass, air ride only, do not stack, etc.), loading hook/lifting points and chain/securing locations where applicable to avoid damage and improper handling. Seller Covenants (defined in Section 15.1) that any wood packing or wood pallet materials delivered or used to deliver, pack and/or transport any goods delivered to Buyer hereunder are in compliance with the International Standards for Phytosanitary Measures (ISPM): Guidelines for Regulating Wood Packaging Material (WPM) in International Trade (ISPM Publication No. 15), U.S. Code of Federal Regulations, 7 CFR 319.40-1 through 319.40-11, as may be changed or amended, if the goods are being shipped to the U.S., and similar laws of other jurisdictions to or through which Buyer informs Seller the goods are likely to be shipped or to or through which Seller otherwise has knowledge that shipment will likely occur. Seller shall provide Buyer with any certifications required by Buyer to evidence its compliance with the foregoing sentence.

**20.    GOVERNING LAW.**  This Order shall in all respects be governed by and interpreted in accordance with the substantive law of the State of New York, U.S., excluding its conflicts of law provisions. The parties exclude application of the United Nations Convention on Contracts for the International Sale of Goods.

**21.    DISPUTE RESOLUTION.**

21.1    If Seller is a permanent resident of the U.S., or a corporation or partnership existing under the laws of the U.S., and Seller and Buyer have a controversy, dispute or difference arising out of this Order ("Dispute"), either party may initiate litigation. Litigation may be brought only in the U.S. District Court for the Northern District of Georgia or, if such court lacks subject matter jurisdiction, in the State or Superior Court of Georgia in Cobb County. The parties submit to the jurisdiction of said courts and waive any defense of *forum non conveniens*. The parties waive all rights to jury trials.

21.2    If Seller is a permanent resident of a country other than the U.S., or is a corporation or partnership existing under the laws of any country other than the U.S., and Seller and Buyer have a Dispute, the parties agree to submit any such Dispute to settlement proceedings under the Alternative Dispute Resolution Rules (the "ADR Rules") of the International Chamber of Commerce ("ICC"). If the Dispute has not been settled pursuant to the ADR Rules within forty-five (45) days following the filing of a request for ADR or within such other period as the parties may agree in writing, such Dispute shall be finally settled under the Rules of Arbitration and Conciliation of the ICC (the "ICC Rules") by one or more arbitrators appointed in accordance with such ICC Rules. The place for arbitration shall be Atlanta, Georgia, U.S. and proceedings shall be conducted in the English language, unless otherwise stated in this Order. The award shall be final and binding on both Buyer and Seller, and the parties hereby waive the right of appeal to any court for amendment or modification of the arbitrators' award.

**22.    WAIVER.**  No claim or right arising out of a breach of this Order can be discharged in whole or in part by a waiver or renunciation unless supported by consideration and made in writing signed by the aggrieved party. Either party's failure to enforce any provisions hereof shall not be construed to be a waiver of a party's right thereafter to enforce each and every such provision.

**23.    ELECTRONIC COMMERCE.**  Seller agrees to participate in all of Buyer's current and future electronic commerce applications and initiatives upon Buyer's request. For contract formation, administration, changes and all other purposes, each electronic message sent between the parties within such applications or initiatives will be deemed: (a) "written" and a "writing"; (b) "signed" (in the manner below); and (c) an original business record when printed from electronic files or records established and maintained in the normal course of business. The parties expressly waive any right to object to the validity, effectiveness or enforceability of any such electronic message on the ground that a "statute of frauds" or any other law requires written, signed agreements. Between the parties, any such electronic documents may be introduced as evidence in any proceedings as business records originated and maintained in paper form. Neither party shall object to the admission of any such electronic document under either the best evidence rule or the business records exception to the hearsay rule. By placing a name or other identifier on any such electronic message, the party doing so intends to sign the message with his/her signature attributed to the message content. The effect of each such message will be determined by the electronic message content and by New York law, excluding any such law requiring signed agreements or otherwise in conflict with this paragraph.

**24.    PERSONAL DATA PROTECTION.**

24.1    "Personal Data" includes any information relating to an identified or identifiable natural person; "Buyer Personal Data" includes any Personal Data obtained by Seller from Buyer; and "Processing" includes any operation or set of operations performed upon Personal Data, such as collection, recording, organization, storage, adaptation or alteration, retrieval, accessing, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, blocking, erasure or destruction.

24.2    Seller, including its officers, directors, employees and/or agents, shall view and Process Buyer Personal Data only on a need-to-know basis and only to the extent necessary to perform this Order or to carry out Buyer's further written instructions.

24.3    Seller shall use reasonable technical and organizational measures to ensure the security and confidentiality of Buyer Personal Data in order to prevent, among other things, accidental, unauthorized or unlawful destruction, modification, disclosure, access or loss. Seller shall immediately inform Buyer of any Security Breach involving Buyer Personal Data, where "Security Breach" means any event involving an actual, potential or threatened compromise of the security, confidentiality or integrity of the data, including but not limited

to any unauthorized access or use. Seller shall also provide Buyer with a detailed description of the Security Breach, the type of data that was the subject of the Security Breach, the identity of each affected person and any other information Buyer may request concerning such affected persons and the details of the breach, as soon as such information can be collected or otherwise becomes available. Seller agrees to take action immediately, at its own expense, to investigate the Security Breach and to identify, prevent and mitigate the effects of any such Security Breach and to carry out any recovery necessary to remedy the impact. Buyer must first approve the content of any filings, communications, notices, press releases or reports related to any Security Breach ("Notices") prior to any publication or communication thereof to any third party. Seller also agrees to bear any cost or loss Buyer may incur as a result of the Security Breach, including without limitation, the cost of Notices.

24.4    Upon termination of this Order, for whatever reason, Seller shall stop the Processing of Buyer Personal Data, unless instructed otherwise by Buyer, and these undertakings shall remain in force until such time as Seller no longer possesses Buyer Personal Data.

24.5    Seller understands and agrees that Buyer may require Seller to provide certain Personal Data ("Seller Personal Data") such as the name, address, telephone number and email address of Seller's representatives in transactions and that Buyer and its Affiliates and its or their contractors may store such data in databases located and accessible globally by their personnel and use it for purposes reasonably related to the performance of this Order, including but not limited to supplier and payment administration. Seller agrees that it will comply with all legal requirements associated with transferring any Seller Personal Data to Buyer, including but not limited to obtaining the consent of any data subject, where required, prior to transferring any Seller Personal Data to Buyer and/or making any required disclosures, filings or the like with relevant data privacy authorities. Buyer will be the Controller of this data for legal purposes and agrees not to share Seller Personal Data beyond Buyer, its Affiliates and its or their contractors, and to use reasonable technical and organizational measures to ensure that Seller Personal Data is processed in conformity with applicable data protection laws. "Controller" shall mean the legal entity which alone or jointly with others determines the purposes and means of the processing of Personal Data. By written notice to Buyer, Seller may obtain a copy of the Seller Personal Data and submit updates and corrections to it.

**25.    ENTIRE AGREEMENT.** This Order, with documents as are expressly incorporated by reference, is intended as a complete, exclusive and final expression of the parties' agreement with respect to the subject matter herein and supersedes any prior or contemporaneous agreements, whether written or oral, between the parties. This Order may be executed in one or more counterparts, each of which shall for all purposes be deemed an original and all of which shall constitute the same instrument. Facsimile signatures on such counterparts are deemed originals. No course of prior dealings and no usage of the trade shall be relevant to determine the meaning of this Order even though the accepting or acquiescing party has knowledge of the performance and opportunity for objection. The term "including" shall mean and be construed as "including, but not limited to", unless expressly stated to the contrary. The invalidity, in whole or in part, of any of the foregoing articles or paragraphs of this Order shall not affect the remainder of such articles or paragraphs or any other article or paragraph of this Order, which shall continue in full force and effect. Further, the parties agree to give any such article or provision deemed invalid, in whole or in part, a lawful interpretation that most closely reflects the original intention of Buyer and Seller. All provisions or obligations contained in this Order, which by their nature or effect are required or intended to be observed, kept or performed after termination or expiration of an Order will survive and remain binding upon and for the benefit of the parties, their successors (including without limitation successors by merger) and permitted assigns including, without limitation, Sections 2.3(b) 4, 5, 7, 8, 9, 12, 15, 16, 17 and 24.



**APPENDIX 3**

**GE POWER & WATER INTEGRITY GUIDE FOR SUPPLIERS,
CONTRACTORS AND CONSULTANTS**

**A Message from GE Power & Water**

The General Electric Company and its GE Power & Water business ("GE") are committed to unyielding Integrity and high standards of business conduct in everything we do, especially in our dealings with GE suppliers, contractors and consultants (collectively "Suppliers"). For well over a century, GE people have created an asset of incalculable value: the company's worldwide reputation for integrity and high standards of business conduct. That reputation, built by so many people over so many years, depends on upholding it in each business transaction we make.

GE bases its Supplier relationships on lawful, efficient and fair practices, and expects its Suppliers to adhere to applicable legal and regulatory requirements in their business relationships, including those with their employees, their local environments, and GE. The quality of our Supplier relationships often has a direct bearing on the quality of our customer relationships. Likewise, the quality of our Suppliers' products and services affects the quality of our own products and services.

To help GE Suppliers understand both: (1) the GE commitment to unyielding Integrity and (2) and the standards of business conduct that all GE Suppliers must meet, GE has prepared this GE Power & Water Integrity Guide for Suppliers, Contractors and Consultants. Suppliers are expected to collaborate with GE's employees so that those employees can continue to consistently meet these GE integrity commitments.

The Guide is divided into four sections:
• GE Code of Conduct
• GE Compliance Obligations
• Responsibilities of GE Suppliers
• How to Raise an Integrity Concern

Suppliers should carefully review this Guide, including but not limited to the section entitled "Responsibilities of GE Suppliers." Suppliers are responsible for ensuring that they and their employees, workers, representatives and subcontractors comply with the standards of conduct required of GE Suppliers. Please contact the GE manager you work with or any GE Compliance Resource if you have any questions about this Guide or the standards of business conduct that all GE Suppliers must meet.

**Steve Bolze**          **Jeffrey Connelly**
President & CEO          Vice President
                        Global Supply Chain Management

12

## GE Code of Conduct

GE's commitment to total, unyielding Integrity is set forth in GE's compliance handbook, *The Spirit & The Letter*. The policies set forth in *The Spirit & The Letter* govern the conduct of all GE employees and are supplemented by compliance procedures and guidelines adopted by GE business components. All GE employees must not only comply with the "letter" of the Company's compliance policies, but also with their "spirit."

The "spirit" of GE's Integrity commitment is set forth in the GE Code of Conduct, which each GE employee has made a personal commitment to follow:

• Obey the applicable laws and regulations governing our business conduct worldwide.
• Be honest, fair and trustworthy in all of your GE activities and relationships.
• Avoid all conflicts of interest between work and personal affairs.
• Foster an atmosphere in which fair employment practices extend to every member of the diverse GE community.
• Strive to create a safe workplace and to protect the environment.
• Through leadership at all levels, sustain a culture where ethical conduct is recognized, valued and exemplified by all employees.

**No matter how high the stakes, no matter how great the challenge, GE will do business only by lawful and ethical means. When working with customers and Suppliers in every aspect of our business, we will not compromise our commitment to integrity.**

## GE Compliance Obligations

All GE employees are obligated to comply with the requirements — the "letter"— of GE's compliance policies set forth in *The Spirit & The Letter*. These policies implement the GE Code of Conduct and are supplemented by compliance procedures and guidelines adopted by GE business components and/or affiliates. A summary of some of the key compliance obligations of GE employees follows:

IMPROPER PAYMENTS
• Always adhere to the highest standards of honesty and integrity in all contacts on behalf of GE. Never offer bribes, kickbacks, illegal political contributions or other improper payments to any customer, government official or third party. Follow the laws of the United States and other countries relating to these matters.
• Do not give gifts or provide any entertainment to a customer or supplier without prior approval of GE management. Make sure all business entertainment and gifts are lawful and disclosed to the other party's employer.
• Employ only reputable people and firms as GE representatives and understand and obey any requirements governing the use of third party representatives.

INTERNATIONAL TRADE CONTROLS
• Understand and follow applicable international trade control and customs laws and regulations, including those relating to licensing, shipping and import documentation and reporting, and record retention requirements.
• Never participate in boycotts or other restrictive trade practices prohibited or penalized under United States or applicable local laws.
• Make sure all transactions are screened in accordance with applicable export/import requirements; and that any apparent conflict between U.S. and applicable local law requirements, such as the laws blocking certain U.S. restrictions adopted by Canada, Mexico and the members of the European Union, is disclosed to GE counsel.

13

MONEY LAUNDERING PREVENTION
• Follow all applicable laws that prohibit money laundering and that require the reporting of cash or other suspicious transactions.
• Learn to identify warning signs that may indicate money laundering or other illegal activities or violations of GE policies. Raise any concerns to GE counsel and GE management.

PRIVACY
• Never acquire, use or disclose individual information in ways that are inconsistent with GE privacy policies or with applicable privacy and data protection laws, regulations and treaties.
• Maintain secure business records of information, which is protected by applicable privacy regulations, including computer-based information.

SUPPLIER RELATIONSHIPS
• Only do business with suppliers who comply with local and other applicable legal requirements and any additional GE standards relating to labor, environment, health and safety, intellectual property rights and improper payments.
• Follow applicable laws and government regulations covering supplier relationships.
• Provide a competitive opportunity for suppliers to earn a share of GE's purchasing volume, including small businesses and businesses owned by the disadvantaged, minorities and women.

REGULATORY EXCELLENCE
• Be aware of the specific regulatory requirements of the country and region where the work is performed and that affect the GE business.
• Gain a basic understanding of the key regulators and the regulatory priorities that affect the GE business.
• Promptly report any red flags or potential issues that may lead to a regulatory compliance breach.
• Always treat regulators professionally and with courtesy and respect.
• Assure that coordination with business or corporate experts is sought when working with or responding to requests of regulators.

WORKING WITH GOVERNMENTS
• Follow applicable laws and regulations associated with government contracts and transactions.
• Be truthful and accurate when dealing with government officials and agencies.
• Require any supplier or subcontractor providing goods or services for GE on a government project or contract to agree to comply with the intent of GE's Working with Governments policy and applicable government contract requirements.
• Do not do business with suppliers or subcontractors that are prohibited from doing business with the government.
• Do not engage in employment discussions with a government employee or former government employee without obtaining prior approval of GE management and counsel.

COMPLYING WITH COMPETITION LAWS
• Never propose or enter into any agreement or understanding with a GE competitor to fix prices, terms and conditions of sale, costs, profit margins or other aspects of the competition for sales to third parties.
• Do not propose or enter into any agreements or understandings with GE customers restricting resale prices.
• Never propose or enter into any agreements or understandings with suppliers that restrict the price or other terms at which GE may resell or lease any product or service to a third party.

ENVIRONMENT, HEALTH & SAFETY
• Conduct your activities in compliance with all relevant environmental and worker health and safety laws and regulations and conduct your activities accordingly.

14

- Ensure that all new product designs or changes or service offerings are reviewed for compliance with GE guidelines.
- Use care in handling hazardous materials or operating processes or equipment that use hazardous materials to prevent unplanned releases into the workplace or the environment.
- Report to GE management all spills of hazardous materials; any concern that GE products are unsafe; and any potential violation of environmental, health or safety laws, regulations or company practices or requests to violate established EHS procedures.

FAIR EMPLOYMENT PRACTICES
- Extend equal opportunity, fair treatment and a harassment-free work environment to all employees, co-workers, consultants and other business associates without regard to their race, color, religion, national origin, sex (including pregnancy), sexual orientation, age, disability, veteran status or other characteristic protected by law.

SECURITY AND CRISIS MANAGEMENT
- Implement rigorous plans to address security of employees, facilities, information, IT assets and business continuity.
- Protect access to GE facilities from unauthorized personnel.
- Protect IT assets from theft or misappropriation.
- Create and maintain a safe working environment.
- Ensure proper business continuity plans are prepared for emergencies.
- Screen all customers, suppliers, agents and dealers against terrorist watchlists.
- Report any apparent security lapses.

CONFLICTS OF INTEREST
- Financial, business or other non-work related activities must be lawful and free of conflicts with one's responsibilities to GE.
- Report all personal or family relationships, including those of significant others, with current or prospective suppliers you select, manage or evaluate.
- Do not use GE equipment, information or other property (including office equipment, e-mail and computer applications) to conduct personal or non-GE business without prior permission from the appropriate GE manager.

CONTROLLERSHIP
- Keep and report all GE records, including any time records, in an accurate, timely, complete and confidential manner.  Only release GE records to third parties when authorized by GE.
- Follow GE's General Accounting Procedures (GAP), as well as all generally accepted accounting principles, standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.
- Financial statements and reports prepared for or on behalf of GE (including any component or business) must fairly present the financial position, results of operations and/or other financial data for the periods and/or the dates specified.

INSIDER TRADING OR DEALING & STOCK TIPPING
- Never buy, sell or suggest to someone else that they should buy or sell stock or other securities of any company (including GE) while you are aware of significant or material non-public information ("inside information") about that company.  Information is significant or material when it is likely that an ordinary investor would consider the information important in making an investment decision.
- Do not pass on or disclose inside information unless lawful and necessary for the conduct of GE business — and never pass on or disclose such information if you suspect that the information will be used for an improper trading purpose.

15



INTELLECTUAL PROPERTY
• Identify and protect GE intellectual property in ways consistent with the law.
• Consult with GE counsel in advance of soliciting, accepting or using proprietary information of outsiders, disclosing GE proprietary information to outsiders or permitting third parties to use GE intellectual property.
• Respect valid patents, trademarks, copyrighted materials and other protected intellectual property of others; and consult with GE counsel for licenses or approvals to use such intellectual property.

### Responsibilities of GE Suppliers

GE will only do business with Suppliers that comply with all applicable legal and regulatory requirements.  Today's regulatory environment is becoming more challenging, subjecting GE and its Suppliers to a growing number of regulations and enforcement activities around the world.  This environment requires that GE and its Suppliers continue to be knowledgeable about and compliant with all applicable regulations and committed to regulatory excellence.  Suppliers that transact business with GE are also expected to comply with their contractual obligations under any purchase order or agreement with GE and to adhere to the standards of business conduct consistent with GE's obligations set forth in the "GE Compliance Obligations" section of this Guide and to the standards described in this section of the Guide.  A Supplier's commitment to full compliance with these standards and all applicable laws and regulations is the foundation of a mutually beneficial business relationship with GE.

GE expects its Suppliers, and any Supplier's subcontractors, that support GE's work with government customers to be truthful and accurate when dealing with government officials and agencies, and adhere strictly to all compliance obligations relating to government contracts that are required to flow down to GE's suppliers.

As stated above, GE requires and expects each GE Supplier to comply with all applicable laws and regulations. Unacceptable practices by a GE Supplier include:

•     Minimum Age.  Employing workers younger than sixteen (16) years of age or the applicable required minimum age, whichever is higher.
•     Forced Labor.  Using forced, prison or indentured labor or workers subject to any form of compulsion or coercion or trafficking in persons in violation of the U.S. Government's zero tolerance policy or other applicable laws or regulations.
•     Environmental Compliance.  Lack of commitment to observing applicable environmental laws and regulations.  Actions that GE will consider evidence of a lack of commitment to observing applicable environmental laws and regulations include:
—     Failure to maintain and enforce written and comprehensive environmental management programs, which are subject to periodic audit.
—     Failure to maintain and comply with all required environmental permits.
—     Permitting any discharge to the environment in violation of law or issued/required permits or that would otherwise have an adverse impact on the environment.
•     Health & Safety.  Failure to provide workers a workplace that meets applicable health, safety and security standards.
•     Human Rights.
—     Failure to respect human rights of Supplier's employees.
—     Failure to observe applicable laws and regulations governing wage and hours.
—     Failure to allow workers to freely choose whether or not to organize or join associations for the purpose of collective bargaining as provided by local law or regulation.
—     Failure to prohibit discrimination, harassment and retaliation.

- Code of Conduct. Failure to maintain and enforce GE policies requiring adherence to lawful business practices, including a prohibition against bribery of government officials.
- Business Practices and Dealings with GE. Offering or providing, directly or indirectly, anything of value, including cash, bribes, gifts, entertainment or kickbacks, to any GE employee, representative or customer or to any government official in connection with any GE procurement, transaction or business dealing. Such prohibition includes the offering or providing of any consulting, employment or similar position by a Supplier to any GE employee (or their family member or significant other) involved with a GE procurement. GE also prohibits a GE Supplier from offering or providing GE employees, representatives or customers or any government officials with any gifts or entertainment, other than those of nominal value to commemorate or recognize a particular GE Supplier business transaction or activity. In particular, a GE Supplier shall not offer, invite or permit GE employees and representatives to participate in any Supplier or Supplier-sponsored contest, game or promotion.
- Business Entertainment of GE Employees and Representatives. Failure to respect and comply with the business entertainment (including travel and living) policies established by GE and governing GE employees and representatives. A GE Supplier is expected to understand the business entertainment policies of the applicable GE business component or affiliate before offering or providing any GE employee or representative any business entertainment. Business entertainment should never be offered to a GE employee or representative by a Supplier under circumstances that create the appearance of an impropriety.
- Collusive Conduct and GE Procurements. Sharing or exchanging any price, cost or other competitive information or the undertaking of any other collusive conduct with any other third party to GE with respect to any proposed, pending or current GE procurement.
- Intellectual Property and Other Data and Security Requirements. Failure to respect the intellectual and other property rights of others, especially GE. In that regard, a GE Supplier shall:
— Only use GE information and property (including tools, drawings and specifications) for the purpose for which they are provided to the Supplier and for no other purposes.
— Take appropriate steps to safeguard and maintain the confidentiality of GE proprietary information, including maintaining it in confidence and in secure work areas and not disclosing it to third parties (including other customers, subcontractors, etc.) without the prior written permission of GE.
— If requested by GE, only transmit information over the Internet on an encrypted basis.
— Observe and respect all GE patents, trademarks and copyrights and comply with such restrictions or prohibitions on their use as GE may from time-to-time establish.
— Comply with all applicable rules concerning cross-border data transfers.
— Maintain all personal and sensitive data, whether of GE employees or its customers in a secure and confidential manner, taking into account both local requirements and the relevant GE policies provided to the Supplier.
- Trade Controls & Customs Matters. The transfer of any GE technical information to any third party without the express, written permission of GE. Failure to comply with all applicable trade control laws and regulations in the import, export, re-export or transfer of goods, services, software, technology or technical data including any restrictions on access or use by unauthorized persons or entities, and failure to ensure that all invoices and any customs or similar documentation submitted to GE or governmental authorities in connection with transactions involving GE accurately describe the goods and services provided or delivered and the price thereof.
- Use Of Subcontractors or Third Parties to Evade Requirements. The use of subcontractors or other third parties to evade legal requirements applicable to the Supplier and any of the standards set forth in this Guide.

The foregoing standards are subject to modification at the discretion of GE. Please contact the GE manager you work with or any GE Compliance Resource if you have any questions about these standards and/or their application to particular circumstances. Each GE Supplier is responsible for ensuring that its employees and representatives understand and comply with these standards. GE will only do business with those Suppliers that comply with applicable legal and regulatory requirements

17

and reserves the right, based on its assessment of information available to GE, to terminate, without liability to GE, any pending purchase order or contract with any Supplier that does not comply with the standards set forth in this section of the Guide.

### How to Raise an Integrity Concern

Subject to local laws and any legal restrictions applicable to such reporting, each GE Supplier is expected to promptly inform GE of any Integrity concern involving or affecting GE, whether or not the concern involves the Supplier, as soon as the Supplier has knowledge of such Integrity concern. A GE Supplier shall also take such steps as GE may reasonably request to assist GE in the investigation of any Integrity concern involving GE and the Supplier.

I. Define your concern: Who or what is the concern? When did it arise? What are the relevant facts?

II. Prompt reporting is crucial -- an Integrity concern may be raised by a GE Supplier as follows:
  • By discussing it with a cognizant GE Power & Water Manager;
  • By calling the GE Power & Water Integrity Helpline at +1 800-443-1391 or +1 678-844-4967 or the GE Corporate Integrity Helpline at +1 800-227-5003 or +1 203-373-2603;
  • By emailing ombudsperson@corporate.ge.com; or
  • By contacting any Compliance Resource (e.g., GE legal counsel or auditor). A GE Compliance Resource will promptly review and investigate the concern.

III. GE Policy forbids retaliation against any person reporting an Integrity concern.

18